RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

**17-1428**

NATHANIEL BRENT; ROBERT BRENT,

*Plaintiffs-Appellees*,

*v.*

WAYNE COUNTY DEPARTMENT OF HUMAN SERVICES et al.,

*Defendants*,

MIA WENK; SHEVONNE TRICE; HEATHER DECORMIER-MCFARLAND; MONICIA SAMPSON; CHARLOTTE MCGEHEE; JOYCE LAMAR,

*Defendants-Appellants*.

Nos. 17-1428/1811

───────────────────────────────────────────

**17-1811**

NATHANIEL BRENT; ROBERT BRENT,

*Plaintiffs-Appellants*,

*v.*

WAYNE COUNTY DEPARTMENT OF HUMAN SERVICES; MIA WENK; SHEVONNE TRICE; HEATHER DECORMIER-MCFARLAND; MONICIA SAMPSON; CHARLOTTE MCGEHEE; JOYCE LAMAR; EMINA BIOGRADLIJA; MICHAEL BRIDSON; DETROIT POLICE DEPARTMENT; TWO UNKNOWN DETROIT POLICE OFFICERS; METHODIST CHILDREN'S HOME SOCIETY; THE CHILDREN'S CENTER; LESLIE SMITH,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:11-cv-10724—Judith E. Levy, District Judge.

Decided and Filed:  August 23, 2018

Before:  MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

---

**COUNSEL**

---

**ON BRIEF IN 17-1428**:  Lisa C. Geminick, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Appellants.  Nathaniel Brent, Robert Brent, Detroit, Michigan, pro se.  **ON BRIEF IN 17-1811:** Lisa C. Geminick, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for State of Michigan Appellees.  Christyn M. Scott, DYKEMA GOSSETT PLLC, Bloomfield Hills, Michigan, for Appellee Methodist Children's Home Society.  David M. Saperstein, MADDIN, HAUSER, ROTH & HELLER, P.C., Southfield, Michigan, for Appellee The Children's Center.  Sheri L. Whyte, CITY OF DETROIT, Detroit, Michigan, for Appellees City of Detroit, Emina Biogradlija, and Michael Bridson.  Nathaniel Brent, Robert Brent, Detroit, Michigan, pro se.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  This case marks the latest appeal in the nearly eight-year-long litigation between the Brent family and the various entities involved in the State of Michigan's temporary removal of Nathaniel and Sherrie Brent's children from their home in 2010.  After six years and 270 docket entries, the district court ultimately entered judgment in all the various defendants' favor.  We now **AFFIRM** in part, **REVERSE** in part, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

**I. BACKGROUND**

**A.  Factual Background**

On January 17, 2010, fifteen-year-old Robert Brent ran away from home and arrived at a Detroit Police station wearing no shirt, no shoes, and a pair of shorts.  R. 222 (Second Am. Compl. at 5) (Page ID #5174).  This ultimately led employees of Wayne County Department of Health Services ("DHS")—including child-protective-services caseworker Mia Wenk, supervisor Monica Sampson, and intern Heather Decormier-McFarland—to open an investigation into Robert's parents, Nathaniel and Sherrie Brent, for potential child abuse and child neglect.  *Id.* at 5–8 (Page ID #5174–77).  During the course of their investigation, DHS employees visited the Brents' home on two occasions.  *Id.*  During the second visit, Sampson and Decormier-

McFarland allegedly took photographs of the interior of Brents' home without the Brents' consent. *Id.* at 8 (Page ID #5177).

On February 18, 2010, the DHS employees petitioned the Family Division of the Third Judicial Circuit Court for Wayne County ("Family Court") for an order authorizing the removal of the five Brent children from their home. *Id.* at 14–15 (Page ID #5183–84). Wenk drafted and submitted the petition, and Sampson and Sampson's supervisor, Joyce Lamar, co-signed the petition. *Id.* at 50 (Page ID #5220). In a page of "Allegations" accompanying the petition, Wenk detailed the poor conditions of the Brents' home, her concerns about lead-based paint on the walls, and her concerns about the Brents' youngest child, who was ten-years old and appeared to have a severe speech impediment. R. 231-1 (Petition at 2) (Page ID #5324). According to plaintiffs, Wenk knowingly included false information in the petition and withheld other relevant information. R. 222 (Second Am. Compl. at 12, 14) (Page ID #5181, 5183). Plaintiffs further allege that the Family Court judge whose signature appeared on the order, Judge Leslie Smith, never actually reviewed or approved the order. *Id.* at 12–13 (Page ID #5181–82). Instead, according to plaintiffs, Judge Smith instituted a policy allowing probation officers to use a rubber stamp bearing her name to approve child removal orders, and that policy was purportedly followed in this case. R. 115 (Pl. Mot. for Reconsideration at 3–4) (Page ID #2376–77).

The removal order was executed that same evening. R. 222 (Second Am. Compl. at 13, 53) (Page ID #5182, 5223). Wenk allegedly enlisted the assistance of Detroit Police Officers to execute the order by falsely claiming that previous attempts to remove the children had been unsuccessful. *Id.* at 13 (Page ID #5182). When the police arrived at the Brents' home, Officer Bridson knocked on the door and told Nathaniel Brent ("Brent") that the police had a warrant to remove the children. *Id.* at 53 (Page ID #5223). Brent asked to see the warrant, and Officer Michael Bridson refused and stated that the police were "going to secure the area first." *Id.* He then "pushed his way past" Brent and entered the home, and Officer Emina Biogradlija followed behind him. *Id.* Five minutes later, two additional officers entered the house and showed Brent the removal order. *Id.* Brent reviewed the order and told the officers that it was facially defective, but the police officers removed the children nonetheless. *Id.* at 54 (Page ID #5224).

When the youngest child attempted to hold onto his mother, one of the officers "ripped him from his mother and pushed him out the front door." *Id.* According to Brent, the Detroit Police Department's internal policy bars Detroit Police Officers from serving civil orders. *Id.*

On February 19, 2010, a preliminary hearing was held before Referee Bobak, and the court appointed guardians at litem and counsel for the parents. R. 163 (Order at 6) (Page ID #4117); R. 222 (Second Am. Compl. at 35) (Page ID #5205). On February 24, 2010, the Family Court held a probable-cause hearing and found probable cause to authorize the petition of removal. R. 113 (Order at 3) (Page ID #2262). Also on that date, Shevonne Trice, a foster-care caseworker with the Wayne County DHS Foster Care Department, was appointed as the caseworker for the Brent family. R. 222 (Second Am. Compl. at 3, 35) (Page ID #5172, 5205).

On March 3, 2010, Trice placed Brent's male children in the home of Michael and Noel Chinavare. *Id.* at 36 (Page ID #5206). Trice allegedly drafted and gave the Chinavares a document claiming they were the temporary guardians of the children, even though neither the parents nor the court had authorized this guardianship. *Id.* Brent's male children were later placed with Methodist Children's Home Society ("Methodist"), a "residential care facility licensed and regulated by the State of Michigan for the care, treatment, and detainment of court and state wards." *Id.* at 56 (Page ID #5226).

While Brent's male children were staying at the Methodist, Robert became ill. *Id.* at 57 (Page ID #5227). On April 14, 2010, Brent and his wife learned during a family visit with their children that the facility nurse at Methodist, Mary Ann Stokes, had given Robert medication for his cough that had expired in October 2008. *Id.* The Brents immediately informed Trice, who was also at the family visit, but Trice failed to report Methodist for its allegedly medically negligent treatment of Robert. *Id.* at 41 (Page ID #5211). The next day, Brent spoke with Stokes and told her that Robert needed to be seen by a doctor as soon as possible. *Id.* at 57 (Page ID #5227). On April 16, 2010, Robert's condition worsened and he repeatedly asked to see a doctor. *Id.* After his requests were denied for several hours, Robert left Methodist and went to a hospital. *Id.* By that point, Robert was coughing up blood and was diagnosed with acute bronchitis and acute pharyngitis. *Id.* After Robert returned to Methodist, his condition initially improved and then again worsened. *Id.* at 58 (Page ID #5228). Brent and Robert repeatedly

asked for Robert to see a doctor, but these requests were denied "the entire time [Robert] remained at Methodist." *Id.*

Meanwhile, Trice had transferred Brent's female children to the home of Renee Samples on April 28, 2010. *Id.* at 42 (Page ID #5212). Also on that date, Trice transferred supervision of their placement to the Children's Center. *Id.* On May 2, 2010, the Children's Center, Methodist, and Trice held a conference to set the family's visitation schedule, but neither the children nor the parents were allowed to participate in the conference. *Id.* at 42–43 (Page ID #5212–13). When Brent complained about the new visitation schedule, the Children's Center told him that this was the set schedule "whether he liked it or not." R. 114 (First Am. Compl. at 77) (Page ID #2359). A few days later, the Brents' sons were late in arriving to the family's first scheduled visit. *Id.* When the Brents complained to the Children's Center that their sons had not yet arrived, the Children's Center supervisor allegedly told the Brents that if they "didn't stop complaining she would suspend all visitation." *Id.* Also during this visit, the Children's Center supervisor told the Brents in front of their children that "if they loved their children they would take the plea deal" that had been offered. *Id.* at 78 (Page ID #2360). When the parents refused to "admit to false allegations," the Children's Center supervisor announced that she was ending all phone contact between the parents and their female children. *Id.*

Ultimately, a trial was held in Family Court from May 11, 2010 through May 13, 2010, and a jury found that "one or more statutory grounds existed for the Family Court to exercise jurisdiction over the Brent children." R. 113 (Order at 3) (Page ID #2262). The children were released to the Brents on June 2, 2010 but remained under DHS supervision. *Id.* After finding that the conditions in the family's home had improved and that the children's needs were being met, the Family Court ended its supervision on September 10, 2010. *Id.* at 3–4 (Page ID #2262–63).

## B. Procedural History

Nathaniel Brent first filed suit in federal court on February 22, 2011, levying a variety of federal and state-law claims against seemingly every person or agency involved in the removal, custody, and care of his five children. R. 1 (Compl.) (Page ID #1–29). On November 28, 2011,

the district court dismissed Brent's claims against all the "Judicial Defendants"—i.e., the Wayne County Family Court judges and referees involved in Brent's case.  R. 113 (Order at 22) (Page ID #2281).  Among those defendants was Judge Leslie Smith, the Wayne County Family Court judge whose stamped signature appeared on the order authorizing the removal of Brent's children.  At the same time, the district court granted Brent leave to file an amended complaint, but the district court instructed Brent not to reassert any claims against the Judicial Defendants (or any other defendants who had been dismissed from the case).  *Id.*  Brent filed his first amended complaint, R. 114 (First Am. Compl.) (Page ID #2283–2365), and moved for reconsideration of the district court's dismissal of his claims against the Judicial Defendants, including Judge Smith, R. 115 (Pl. Mot. for Reconsideration) (Page ID #2366–90).  The district court denied Brent's motion for reconsideration on November 15, 2012.  R. 163 (Order at 7–16) (Page ID #4118–27).

Also on November 15, 2012, the district court denied in part and granted in part various dispositive motions filed in response to Brent's amended complaint.  As is relevant for the purposes of this appeal, the district court dismissed all claims against Methodist and all but two state-law claims against Children's Center.  *Id.* at 71–72 (Page ID #4182–83).  The district court held that Fourth and Fourteenth Amendment claims brought under § 1983 against the Wayne County DHS in its official capacity could proceed, as could Brent's various § 1983 and state-law claims against Wenk, Sampson, Decormier-McFarland, Trice, McGehee, and Lamar.  *Id.* at 72–73 (Page ID #4183–84).

The individual State Defendants (Wenk, Sampson, Decormier-McFarland, Trice, McGehee, and Lamar) appealed the district court's order denying them immunity under federal and state law.  R. 168 (Notice of Appeal) (Page ID #4219).  We held that the defendants were entitled to qualified immunity from Brent's § 1983 claims alleging that the individual State Defendants violated his Fourth Amendment rights when they exceeded the scope of his consent when speaking with Robert during the first home visit on January 20, 2010 and photographed the interior of his home without consent during the second home visit on January 21, 2010.  *Brent v. Wenk*, 555 F. App'x 519, 524–27 (6th Cir. 2014).  We further granted qualified immunity to the individual State Defendants from Brent's § 1983 claims alleging procedural and substantive

violations of Brent's Fourteenth Amendment due-process rights in parenting and raising his children. *Id.* at 529–34. We agreed, however, with the district court's denial of state-law governmental immunity on Brent's gross-negligence and intentional-infliction-of-emotional distress claims. *Id.* at 535–37. Finally, we held that Brent lacked standing to pursue a claim against Trice under Mich. Comp. Laws § 722.633(1) for her alleged failure to report the medical neglect of Robert because Michigan law intended liability under the state statute to "be limited to claims for damages *by the identified abused child* about whom no report was made." *Id.* at 537 (quoting *Murdock v. Higgins*, 559 N.W.2d 639, 646 (Mich. 1997)).

In the meantime, Wayne County DHS and the individual State Defendants had moved for reconsideration of the November 15, 2012 order. They argued that Wayne County DHS is an arm of the State, and therefore all claims against Wayne County DHS and the individual State Defendants in their official capacities should be dismissed. R. 164 (Mot. for Reconsideration at 2) (Page ID #4187). On February 4, 2013, the district court granted this motion and entered summary judgment in favor of Wayne County DHS and Wenk, Sampson, Lamar, McGehee, Trice, and Decormier-McFarland as to all claims brought against them in their official capacities. R. 171 (Order at 3–4) (Page ID #4225–26).

Children's Center had also moved the district court to reconsider its November 15, 2012 order, arguing that the district court erred in allowing Brent's two-remaining claims against Children's Center—a state-law claim for gross negligence and a state-law claim for intentional infliction of emotional distress—to proceed. R. 165 (Mot. for Reconsideration 2) (Page ID #4195). Children's Center insisted that it was entitled to absolute immunity under state law from these two claims. *Id.* The district court ultimately agreed and entered summary judgment in Children's Center's favor on Brent's gross-negligence and IIED claims. R. 199 (Order at 17) (Page ID #4775).

On July 11, 2013, Robert Brent—who had turned eighteen years old on July 11, 2012—moved to join his father as a plaintiff, arguing that he ought to able to assert his own claims given that Brent lacked standing to vindicate the injuries suffered by Robert. R. 182 (Mot. to Join at 1–2) (Page ID #4612–13). Because Robert failed to elucidate what claims he intended to raise, the district court denied Robert's motion "as presently written," but instructed Brent to file

a motion for leave to file a second amended complaint along with a proposed amended complaint that names Robert as a plaintiff and includes his additional claims. R. 199 (Order at 16–17) (Page ID #4774–75). Brent filed the motion for leave to amend the complaint along with a proposed second amended complaint, but the district court denied the motion because the proposed second amended complaint restated claims by Brent against parties who had already been dismissed from the suit. R. 210 (Order at 15) (Page ID #4983). As is relevant for this appeal, the district court instructed Brent to refile his motion for leave to file an amended complaint, but to exclude from the proposed amended complaint any claims—by either Robert or Brent—against the Judicial Defendants, Wayne County DHS or its employees in their official capacities, or Children's Center. *Id.* at 16–18 (Page ID #4984–86). The district court further denied leave for Brent to file any federal-law claims against Methodist Children's Home, though it held that Robert could potentially allege a plausible claim against Methodist for gross negligence. *Id.* at 17–18 (Page ID #4985–86).

On December 9, 2015, Brent refiled a motion for leave to file a proposed second amended complaint and attached a new proposed amended complaint. R. 211 (Motion for Leave to File Second Am. Compl.) (Page ID #4988–5051). On March 4, 2016, the district court granted in part and denied in part Brent's motion.[1] First, the district court held that Robert could join the case as a plaintiff, thereby rejecting Methodist's argument that the statute of limitations barred Robert's request for joinder. R. 221 (Order at 22–23) (Page ID #5149–50). Second, the district court reversed its earlier suggestion that Robert could assert a gross-negligence claim against Methodist, holding instead that "concerns for 'finality of judgments and expeditious termination of litigation'" counseled against allowing "amendments asserting anew claims against Methodist." *Id.* at 24 (Page ID #5151). Third, the district court noted that all claims against the City of Detroit and its police officers ("the City Defendants") had been stayed pending the City's bankruptcy proceedings. *Id.* at 25 (Page ID #5152). Because the stay had been lifted in February 2016, the district court held that Brent's claims against the officers could now proceed via the second amended complaint. *Id.* Fourth, the district court rejected Brent's efforts to assert new claims under the Michigan Constitution against Wenk, Sampson, and Trice

---

[1]On October 3, 2014, this case was reassigned from Judge Julian Abele Cook to Judge Judith Levy.

or to resurrect § 1983 claims against any of the individual State Defendants, even to the extent those claims were now being asserted on behalf of Robert rather than Brent. *Id.* at 27–34 (Page ID #5154–61). The district court allowed, however, plaintiffs to proceed with their preexisting IIED claims against various individual State Defendants, to proceed with Robert's failure-to-report-medical-neglect claim against Trice, and to add new state-law eavesdropping claims against Wenk, Sampson, and Decormier-McFarland. *Id.* at 35–36 (Page ID #5162–63). Fifth, the district court sua sponte struck all of plaintiffs' gross-negligence claims from the proposed second amended complaint, reasoning that Michigan law does not recognize "gross negligence" as an independent cause of action when "allegations of an intentional tort have been made." *Id.* at 26–27, 38–39 (Page ID #5153–54, 5166–67). Brent, with Robert now added as a plaintiff, then filed the second amended complaint.

The City Defendants moved for judgment on the pleadings, which the district court granted on November 9, 2016. R. 250 (Order at 10) (Page ID #5531). The individual State Defendants also moved for judgment on the pleadings on the three state-law claims remaining against these defendants (IIED, eavesdropping, and failure to report medical neglect). R. 230 (Mot. for J. on the Pleadings) (Page ID #5302). The district court determined that the individual State Defendants are entitled to absolute immunity under state law from plaintiffs' IIED and eavesdropping claims, but held that Trice is not entitled to immunity under the Governmental Tort Liability Act from Robert's failure-to-report-medical-neglect claim. R. 249 (Order at 3–10) (Page ID #5513–20). Plaintiffs moved for reconsideration, arguing that the district court erred in dismissing all claims against the City Defendants and erred in granting state-law immunity on the IIED claims against the State Defendants. *See* R. 253 (Mot. for Reconsideration at 1) (Page ID #5543); 257 (Mot. for Reconsideration at 1–2) (Page ID #5589–90). As to their IIED claims against the State Defendants, plaintiffs insisted that the Sixth Circuit had already held in its 2014 decision that the individual State Defendants were not entitled to immunity from plaintiffs' IIED claims. R. 257 (Mot. for Reconsideration at 1–2) (Page ID #5589–90). The State Defendants, in turn, moved for reconsideration on the district court's decision not to grant statutory immunity to Trice from plaintiffs' claim of failure to report medical neglect. R. 255 (Mot. for Reconsideration at 2–5) (Page ID #5577–80).

On March 17, 2017, the district court affirmed its decision as to the City Defendants but reversed its earlier order as to the State Defendants, holding that (1) Trice was, in fact, entitled to statutory immunity from plaintiffs' claim of failure to report medical neglect, and (2) the Sixth Circuit had already denied the individual State Defendants "state-law immunity" as to plaintiffs' IIED claims.  R. 261 (Order at 3–4, 6–8) (Page ID #5650–51, 5653–55).  Although plaintiffs' eavesdropping claims were not before the Sixth Circuit when it denied the State Defendants qualified immunity on the IIED claims, the district court nevertheless reinstated plaintiffs' eavesdropping claims so that "all of plaintiffs' claims [would be] treated uniformly and fairly throughout this case."  *Id.* at 5 (Page ID #5652).

Plaintiffs then moved to alter or amend the district court's latest order to treat its ruling "as a final order as to all claims and Defendants previously dismissed or rejected by this Court or its predecessor."  R. 262 (Mot. to Alter or Amend) (Page ID #5658–59).  The State Defendants filed a statement explaining that they "have no objection to the Court directing that the March 17, 2017 order be a final order for the purpose of an immediate appeal."  R. 263 (Statement at 2) (Page ID #5666).  On April 11, 2017, the district court granted the motion and "certifie[d] for appeal the decision to grant qualified and statutory immunity to the City Defendants, and the decision to grant State Defendant Shevonne Trice statutory immunity."  R. 264 (Order at 6) (Page ID #5673).

The individual State Defendants quickly filed a notice of appeal from the March 17, 2017 order insofar as it denied them state-law immunity from plaintiffs' state-law claims.  R. 265 (Notice of Appeal at 2) (Page ID #5676).  A few days later, plaintiffs filed a motion asking the district court to amend its April 11, 2017 order to allow plaintiffs to appeal the district court's orders as to "**all** claims and defendants that have been dismissed from this suit," and not just plaintiffs' Fourth Amendment claims against the City Defendants and the granting of statutory immunity to Trice.  R. 267 (Mot. to Alter or Amend at 2) (Page ID #5680).  Plaintiffs argued that the district court's April 11, 2017 order, as it currently stood, would create a "piecemeal appeal that should be avoided."  *Id.*

In response, the State Defendants moved the district court to reconsider its denial of state-law immunity to the individual State Defendants, as set forth in the district court's March 17,

2017 order. R. 268 (Mot. for Reconsideration at 1–2) (Page ID #5696–97). Although they had already filed a notice of appeal from the district court's March 17, 2017 order, the individual State Defendants argued that, if the district court opted instead to reconsider that order, "all of the claims [would] be final orders under 28 U.S.C. § 1291 and may proceed to appeal." *Id.* at 2 (Page ID #5697). The district court determined that it had jurisdiction to reconsider its March 17, 2017 order, notwithstanding the State Defendants' pending appeal, and held that the individual State Defendants were in fact entitled to absolute immunity against plaintiffs' IIED and eavesdropping claims. R. 270 (Order at 6) (Page ID #5725). As that decision resolved all claims, the district court entered final judgment and dismissed plaintiffs' complaint with prejudice. R. 271 (Judgment) (Page ID #5727). Plaintiffs filed a timely notice of appeal, R. 281 (Notice of Appeal) (Page ID #5844), and plaintiffs' appeal was subsequently consolidated with the individual State Defendants' appeal from the district court's earlier denial of state-law immunity as to plaintiffs' IIED and eavesdropping claims.

## II. DISCUSSION

As the above background section makes abundantly clear, this case involves a wide variety of claims, defendants, and procedural postures. To the extent possible, we address plaintiffs' claims against defendants in the order in which they were dismissed by the district court.

## A. Judge Leslie Smith

Plaintiffs argue that the district court erred in dismissing the claims Brent levied against Judge Smith in his initial complaint. In particular, plaintiffs argue that Judge Smith violated their Fourth Amendment right to be free from unlawful searches and seizures by "institut[ing] a policy that allowed probation officers to rubber stamp Judge Smith's 'signature' on orders to remove children." Appellant Br. at 18. Though this precise allegation did not appear in Brent's initial complaint, Brent asked the district court for leave to amend his complaint to raise this claim. *See* R. 115 (Pl. Mot. for Reconsideration at 3–4) (Page ID #2376–77). The district court denied Brent's request, reasoning that any such amendment would be futile. *See* R. 163 (Order at 16) (Page ID #4127). We review de novo a district court's determination that proposed

amendments to a complaint could not survive a motion to dismiss. *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986). Because the district court would have been required to dismiss Brent's amended complaint for lack of jurisdiction, we now **AFFIRM**.

The *Rooker-Feldman* doctrine precludes federal district courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The *Rooker-Feldman* doctrine occupies "narrow ground," *id.*, barring only claims where "the source of the injury is the state court decision," *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). If there is instead "some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.* In short, where a plaintiff does not seek "redress for an injury allegedly caused by the *state court decision* itself," but instead "seeks redress for an injury allegedly caused by the *defendant's actions*," *Rooker-Feldman* does not apply. *Id.* at 393 (quoting *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 717 (4th Cir. 2006)).

Here, Brent claims that he is challenging Judge Smith's *actions*—i.e., her institution of the rubber-stamping policy—and not the child-removal order itself. Where, however, an allegedly unlawful policy is inextricably intertwined with a state-court order, we have previously differentiated between claims challenging the policy going forward and claims challenging the policy as applied in the past. Our decision in *Shafizadeh v. Bowles*, 476 F. App'x 71 (6th Cir. 2012), provides an apt analogy. There, a federal plaintiff alleged that the state court's practice of allowing law clerks to issue Emergency Protective Orders was unconstitutional. *Id.* at 72. In pursuing this claim, the *Shafizadeh* plaintiff asserted that a fresh-out-of-law-school law clerk had granted a request by the plaintiff's then-wife for an Emergency Protective Order that required the plaintiff to surrender his guns. *Id.* We held that the *Rooker-Feldman* doctrine did not bar the plaintiff's claim, notwithstanding his complaint's focus on "past injuries suffered as a result of . . . the issuance of the Emergency Protective Order," because the complaint was not "focused *solely* on those past injuries." *Id.* at 72–73 (emphasis added). Because the *Rooker-Feldman* doctrine does not bar "forward-looking, general challenges to state-court practices," we held that

the doctrine "was not a basis for dismissing [the plaintiff's] entire complaint." *Id.* at 73. In other words, while the *Rooker-Feldman* doctrine does not bar a plaintiff from attempting to "clear away" an allegedly unconstitutional state-law policy going forward, it does prevent a plaintiff from seeking "relief against the discipline imposed upon him" by application of an allegedly unlawful policy in the past. *Evans v. Cordray*, 424 F. App'x 537, 540 (6th Cir. 2011) (quoting *Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224, 227 (7th Cir. 1993)).

We see plain parallels between *Shafizadeh* and this case. Like the plaintiff in *Shafizadeh*, Brent alleges that he was harmed by a policy that purportedly enabled unqualified persons to enter legal orders. Here, however, Brent does not wish merely to "clear away" Judge Smith's allegedly unlawful policy for future cases, but instead wants this court to hold that Judge Smith's application of her policy to the child-removal order entered against him was unconstitutional. This is precisely the sort of "specific grievance over specific decisions" that "the *Rooker-Feldman* doctrine intended to bar in the lower federal courts." *Lawrence v. Welch*, 531 F.3d 364, 371 (6th Cir. 2008) (quoting *Loriz v. Connaughton*, 233 F. App'x 469, 475 (6th Cir. 2007)). Thus, the district court lacked jurisdiction to consider Brent's claim that Judge Smith's policy violated the Fourth Amendment as applied to the removal order issued in this case.

Based on his first amended complaint (in which Brent reasserted and expanded on his claims against Judge Smith, notwithstanding the district court's instructions to the contrary), Brent seemingly also desires a declaration that Judge Smith's policy is unconstitutional on a forward-going basis. *See* R. 114 (First Am. Compl. at 81) (Page ID #2363). Though the *Rooker-Feldman* doctrine would not preclude such a claim, *Shafizadeh*, 476 F. App'x at 72–73, Brent has not adequately alleged standing to pursue such a facial challenge. "[A]llegations of past injury alone are not sufficient to confer standing" in declaratory-judgment actions. *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006). Rather, a plaintiff must "demonstrate actual present harm or a significant possibility of future harm" resulting from the state court's continued reliance on Judge Smith's policy. *Id.* (quoting *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998)). Having failed to include allegations of likely future harm in his complaint or amended complaint, Brent has not established standing to bring a facial challenge against Judge Smith's alleged rubber-stamping rule. Thus, the district court lacked

jurisdiction over the entirety of Brent's complaint against Judge Smith and properly dismissed those claims.

## B. Methodist Children's Home Society and the Children's Center

### 1. Claims Brought Against Methodist and Children's Center under 42 U.S.C. § 1983

The district court entered judgment in defendants' favor on all claims brought under 42 U.S.C. § 1983 against Methodist and the Children's Center because Brent—the only plaintiff in the case at that time—had failed to establish that either entity was a "state actor."  R. 163 (Order at 29) (Page ID #4140).  The district court announced that it was entering summary judgment as to these claims, but it is clear from the district court's reasoning that it applied the motion-to-dismiss standard in reaching its decision.  *See* R. 163 (Order at 21–27) (Page ID #4132–38).  When ruling on the issue, the district court never once mentioned any of the materials that the parties had submitted in their motions or responses.  *Id.*  Rather, the district court examined Brent's "relevant arguments" and rejected each as a matter of law.  *Id.* at 23 (Page ID #4134).  In such circumstances, we feel compelled to accept the Children's Center's interpretation that "the District Court did not consider evidence beyond the pleadings" when assessing whether the Children's Center or Methodist were state actors.  Children's Center Appellee Br. at 14 n.2.  As "we are not bound to adhere to the label attached to the trial court's disposition of the case," *United Bhd. of Carpenters, Dresden Local No. 267 v. Ohio Carpenters Health & Welfare Fund*, 926 F.2d 550, 558 (6th Cir. 1991), we conclude that the district court dismissed Brent's claims under the standard set forth in Federal Rule of Civil Procedure 12(b) and review the decision accordingly.

We review de novo a dismissal under Rule 12(b)(6), and we will affirm the district court only if the complaint lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Marie v. Am. Red Cross*, 771 F.3d 344, 361 (6th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In reviewing the district court's judgment, we construe the complaint "in the light most favorable to [Brent]," accept all allegations in the complaint as true, and draw all reasonable inferences in Brent's favor.  *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016).  Additionally, we liberally construe pro se filings—like Brent's—

and hold such complaints "to less stringent standards." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)). Viewing Brent's first amended complaint and plaintiffs' second amended complaint in this way, plaintiffs have alleged enough facts to plausibly state that Methodist and the Children's Center are state actors. We therefore **REVERSE** the district court's resolution of plaintiffs' § 1983 claims against Methodist and Children's Center and **REMAND** for further proceedings consistent with this opinion.

To initiate claims against Methodist and the Children's Center under 42 U.S.C. § 1983, plaintiffs must demonstrate that these entities are state actors. *Reguli v. Guffee*, 371 F. App'x 590, 600 (6th Cir. 2010). Though we have developed three separate tests for assessing whether a private entity is a state actor (the so-called "public functions test," the "state compulsion test," and the "nexus test," *id.*), the Supreme Court has made clear that all of our various "criteria" boil down to a core question: whether "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). (quoting *Jackson v. Met. Edison Co.*, 419 U.S. 345, 351 (1974)). Through its cases, the Court has "identified a host of facts that can bear on the fairness of such an attribution," *id.* at 296, including whether "a nominally private entity . . . is controlled by an 'agency of the State,'" *id.* (quoting *Com. of Pa. v. Bd. of Directors*, 353 U.S. 230, 231 (1957)), whether the private entity "has been delegated a public function by the State," *id.* (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)), and whether the "government is 'entwined in [the private organization's] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296, 301 (1966)).

In assessing whether a "close nexus" exists "between the State and the challenged action," *Brentwood*, 531 U.S. at 295, we are guided by the Supreme Court's analysis in *West*, in which the Court held that a physician employed by North Carolina to provide medical services to state prison inmates acted under the color of state law for the purposes of 42 U.S.C. § 1983 when he treated a prisoner's injuries. 487 U.S. at 54. As the Court explained, North Carolina has constitutional obligations to provide adequate medical care to inmates, and it contracted with private physicians "to fulfill this obligation." *Id.* at 54–55. When the physician-defendant in

*West* treated inmates pursuant to the state regulations and contractual agreements that "authorized and obliged" his care, he did so "clothed with the authority of state law." *Id.* (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

The Court's reasoning in *West* governs our case. Michigan is constitutionally required to protect children who are wards of the state from "the infliction of unnecessary harm," *Lintz v. Skipski*, 25 F.3d 304, 305 (6th Cir. 1994) (quoting *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir. 1990)), and to protect "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child[ren]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) ("[T]he parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law."). Here, Michigan assumed these constitutional obligations when it removed the Brent children from their home, and Michigan subsequently contracted with Children's Center and Methodist to fulfill its duties. Children's Home, in particular, was tasked with supervising foster placements and with making recommendations to the court regarding the children's care and custody, R. 114 (Am. Compl. at 49, 78–79) (Page ID #2331, 2360–61), and both Methodist and Children's Center played active roles in overseeing family visits, developing service plans, and providing counseling services to the children, *id.* at 50, 66 (Page ID #2332, 2348). Plaintiffs have therefore plausibly alleged that, "in fulfilling its affirmative obligation[s], DHS enlisted the service of [Methodist and Children's Home] and the [three] entities worked together" to manage the children's custody and care. *Lethbridge*, 2007 WL 2713733, at *4; *see also Hall v. Smith*, 497 F. App'x 366, 375 n.13 (5th Cir. 2012) (leaving open whether "a private child placement agency could be considered a state actor with respect to the foster child placement decisions it makes pursuant to a contractual relationship with a state").

If anything, Children's Center and Methodist may be even more closely entangled with the state than the physician in *West*, given the extent to which Michigan regulates and dictates the organizations' behavior vis-à-vis the children in their care. *See, e.g.*, Mich. Comp. Laws § 400.14(q), *id.* §§ 722.111 *et seq.* Of course, "[s]tate regulation of a private entity, even if it is extensive and detailed, is not enough to support a finding of state action." *Wolotsky v. Huhn*, 960 F.2d 1331, 1336 (6th Cir. 1992). But where, as here, there exists a close nexus "between the

challenged action[s] and the regulatory scheme alleged to be the impetus behind the private action[s]," the state action requirement has been satisfied.  *Id.*  Given that a number of plaintiffs' allegations concern conduct the child-care organizations and DHS employees undertook together, plaintiffs have pleaded sufficiently that Methodist and the Children's Center are state actors to survive a motion to dismiss.

Because the district court declined to consider Methodist's and Children's Center's other arguments regarding plaintiffs' § 1983 claims, we leave it to the district court to resolve these issues in the first instance.  *See Stanek v. Greco*, 323 F.3d 476, 480 (6th Cir. 2003).  That said, we note that plaintiffs' ability to survive a motion to dismiss with respect to the state-actor question does not necessarily mean that they could survive summary judgment on their § 1983 claims.  On remand, plaintiffs must point to record evidence creating a genuine issue of material fact that Methodist and the Children's Center are state actors.  *See Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  In addition, the district court must determine whether plaintiffs have raised cognizable claims under § 1983.  The district court did not address this argument below, Methodist only cursorily briefed the issue on appeal, and the Children's Center did not press the issue at all.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alteration in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 294 (1st Cir. 1995)).  So this is not the time to decide whether plaintiffs have stated a claim under § 1983.  Nothing in our opinion today should be read to hold that they have.  Accordingly, the district court can consider both the state actor and § 1983 issues at summary judgment.

## 2. Robert's State-Law Claims Against Methodist[2]

Because the district court had already dismissed Methodist from the case before considering whether to grant Robert's request to add claims as a new plaintiff, the district court prohibited Robert from bringing any new claims against Methodist.  R. 221 (Order at 24) (Page ID #5151).  The district court also determined that Robert's assertions of an IIED claim against

---

[2]Plaintiffs have not appealed the district court's denial of Brent's state-law claims against Methodist; those claims are therefore now waived.

Methodist would be "futil[e]," as his allegations did not "come close" to showing that Methodist's actions "would cause 'distress so severe that no reasonable man could be expected to endure it.'"  R. 210 (Order at 17) (Page ID #4985) (quoting R. 163 (Order at 64) (Page ID #4175)).  Plaintiffs now appeal the district court's denial with respect to Robert's IIED claim and negligence claim against Methodist.  Appellant Br. at 41–42.

We review de novo the district court's determination that Robert's proposed IIED claim could not survive a motion to dismiss, *Associated Truck Lines*, 801 F.2d at 248, and we now **AFFIRM**.  To set forth a claim for IIED under Michigan law, a plaintiff must show extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress.  *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010).  "Such conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"  *Id.* (quoting *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999)).

The allegations set forth in plaintiffs' first proposed second amended complaint, R. 201 (First Proposed Second Am. Compl. at 73–80 (Page ID #4861–68), second proposed amended complaint, R. 211 (Second Proposed Second Am. Compl. at 56–60) (Page ID #5045–49), and second amended complaint, R. 222 (Second Am. Compl. at 56–60) (Page ID #5226–5230), fail to set forth a plausible IIED claim against Methodist.  To start, "the complaint is devoid of allegations that" Methodist gave Robert expired medication or denied him access to a physician "for the purposes of inflicting severe emotional distress."  *Cebulski v. City of Belleville*, 401 N.W.2d 616, 618–19 (Mich. Ct. App. 1986).  Nor do Robert's allegations indicate that he actually suffered severe emotional distress.  Finally, and perhaps most importantly, Methodist's alleged conduct here simply does not amount to "extreme and outrageous conduct" under Michigan law.  In *Jones*, we considered whether a deceased prison inmate (through his personal representative) could survive summary judgment on an IIED claim against nurses who had denied him access to a physician for months, even though the inmate was "visibly ill and not eating meals" and had lost forty-six pounds in a six-month period.  *Jones*, 625 F.3d at 938–39.  We concluded that even if the nurses' decision to ignore the decedent's request for medical assistance "for several months . . . could reasonably be construed as deliberately indifferent to

Jones's serious medical needs, it does not establish that they acted intentionally or in a manner that is sufficiently extreme or serious to satisfy [an IIED] claim" under Michigan law. *Id.* at 948. If the behavior at issue in *Jones* was insufficient to establish an IIED claim as a matter of law, then so too is the alleged misconduct here. The district court therefore properly barred Robert's IIED claim on the ground that allowing such an amendment would be futile.

The district court barred Robert from asserting negligence and gross-negligence claims against Methodist on the ground that Methodist had already been fully dismissed from the litigation. R. 221 (Order at 24) (Page ID #5151). Because we now hold that the district court erred in dismissing Brent's federal-law claims against Methodist based on his purported failure to establish that Methodist was a state actor, we **REMAND** this case to the district court to decide in the first instance whether Robert's negligence and gross-negligence claims against Methodist should proceed. We agree, however, with the district court's rejection of Methodist's statute of limitations argument. Robert filed a motion to join as plaintiff on July 11, 2013, R. 182 (Mot. to Join as Pl.) (Page ID #4612–13)—the last day that he could bring tort claims against Methodist under Michigan law. *See* Mich. Comp. Laws §§ 600.5805(2); 600.5851(1). Though the motion failed to satisfy the requirements for initiating a complaint, the Supreme Court has "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). The district court therefore did not abuse its discretion in allowing equitable tolling in this case. *See Truitt v. Cty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998).

### 3. Plaintiffs' State-Law Claims Against the Children's Center

In his first amended complaint, Brent asserted two state-law claims against the Children's Center. First, Brent alleged that the Children's Center intentionally inflicted emotional distress on him (1) by telling him and his wife, in front of their children, that they would accept the plea deal they had been offered in Family Court if they loved their children, and (2) by cutting off phone contact between the Brents and their children in an effort to convince the parents to take the plea deal. R. 114 (Am. Compl. at 81) (Page ID #2363). Second, the Children's Center was allegedly "grossly negligent in their affirmative duty to help reunify the family." *Id.* The district

court ultimately determined that the Children's Center was entitled to immunity under *Martin v. Children's Aid Soc.*, 544 N.W.2d 651 (Mich. 1996).  We **AFFIRM**.

*Martin* shields social workers from liability for "initiating and monitoring child placement proceedings and placements."  544 N.W.2d at 654.  Unlike absolute immunity under federal law, absolute immunity under *Martin* is "not limited to 'quasi-prosecutorial or quasi-judicial' actions."  *Braverman v. Hall*, No. 253619, 2005 WL 1123889, at *1 (Mich. Ct. App. May 12, 2005).  The Michigan courts have justified *Martin*'s broad grant of immunity by reasoning that state courts "regularly review[] the placement recommendations" made by social workers, *Martin*, 544 N.W.2d at 656, and therefore parents distressed by social workers' actions "may avail themselves of the safeguards built into the adjudication process," *McCarthy v. Scofield*, No. 284129, 2009 WL 3235639, at *6 (Mich. Ct. App. Oct. 8, 2009).

Plaintiffs argue, first, that the district court erred in granting the Children's Center immunity under *Martin* because the Children's Center failed to plead this affirmative defense in its initial responsive pleading.  Federal law governs whether a defense has been waived in federal court, but state law governs which defenses must be pleaded affirmatively to avoid waiver.  *See Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901 (6th Cir. 2002).  Here, both parties seem to agree that absolute immunity under *Martin* is an affirmative defense that can be waived if not properly pleaded, and we agree.  As the Supreme Court of Michigan has reasoned that governmental immunity to individuals is an affirmative defense that individual officials bear the burden of raising and proving, we conclude that the same logic applies to absolute immunity under *Martin*.  *See Odom v. Wayne Cty.*, 760 N.W.2d 217, 226–28 (Mich. 2008).  The question therefore becomes whether, under federal law, the Children's Center waived its state-law immunity defense.

Federal Rule of Civil Procedure 8(c) requires defendants to raise affirmative defenses in their first responsive pleadings; the failure to do so may result in waiver of the defense.  *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004); *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986) ("Since immunity must be affirmatively pleaded, it follows that failure to do so can work a waiver of the defense.").  "It is well established, however, that failure to raise an affirmative defense by responsive pleading does not always result in waiver." *Moore, Owen,*

*Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993), *as amended on denial of reh'g* (Aug. 31, 1993). "[T]he purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." *Id.* "Thus, if a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Id.* (quoting *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989)).

Here, the Children's Center did not raise *Martin* immunity in its answer to Brent's initial complaint, *see* R. 41 (Answer at 21–22) (Page ID #265–66), but it did raise the defense in its first filing with the district court following Brent's filing of his amended complaint, *see* R. 118 (Mot. to Dismiss at 7–10) (Page ID #2567–70). Given that the Children's Center promptly raised the defense as soon as Brent filed a superseding complaint, we cannot conclude that plaintiffs were prejudiced in any way by the Children's Center's failure to raise the defense earlier. This is not a case where a defendant raised an immunity defense for the first time "days before the trial was scheduled to commence," *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991), or after the close of discovery, when a plaintiff's opportunity to gather relevant evidence in rebuttal would be harmed, *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 751 (6th Cir. 2015). Under the circumstances of this case, we conclude the Children's Center did not waive its defense under *Martin*.[3]

Plaintiffs nevertheless argue that the Children's Center is not entitled to *Martin* immunity on the merits. Here, again, we disagree. Plaintiffs' argument, essentially, is that the Children's Center had no authority to attempt to coerce plaintiffs into taking a deal, and therefore they cannot be immunized for this conduct. Appellant Br. at 43–44. We are aware of no support in Michigan law for this claim. Indeed, the *Martin* court specifically granted immunity to defendants who had been accused of "bad faith," which would appear to cover plaintiffs' allegations in this case. *See* 544 N.W.2d at 654. At bottom, *Martin* immunity does not arise out of Michigan's governmental immunity statute, *id.* at 655 n.5, and thus, unlike that statute, its protections are not limited to behavior that an officer "reasonably believes . . . [to be] within the

---

[3]Because we hold that the Children's Center did not waive its immunity under *Martin*, we need not decide whether plaintiffs waived their waiver argument by failing to raise it earlier.

scope of his or her authority," Mich. Comp. Laws § 691.1407(2)(a). The district court therefore properly granted the Children's Center absolute immunity from plaintiffs' state-law claims.

## C. Wayne County DHS and the Individual State Defendants in Their Official Capacities

The Eleventh Amendment bars suits against a state or its agencies in federal court unless the state consents to suit or Congress abrogated states' immunity with respect to certain claims. *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997). Municipalities and municipal agencies "generally do not receive Eleventh Amendment immunity." *Denton v. Bedinghaus*, 40 F. App'x 974, 978 (6th Cir. 2002). "However, when acting on a particular issue or in a particular area, a local government official or entity may serve as an alter ego or arm of the state and, in that capacity, it may receive Eleventh Amendment protection." *Id.*

Here, the district court initially determined that Wayne County DHS and its employees were not entitled to sovereign immunity. *See* R. 163 (Order at 31–32) (Page ID #4142–43). Upon reconsideration, however, the district court held that Wayne County DHS served as an "arm of the state" in its dealings with the Brent family, and therefore both the agency and its employees were entitled to immunity from claims brought against them in their official capacities. R. 171 (Order at 3–4) (Page ID #4225–26). We review de novo the district court's grant of summary judgment in defendants' favor, and we make all reasonable inferences in plaintiffs' favor. *Timmer*, 104 F.3d at 842. Summary judgment is appropriate if a movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As the district court properly granted summary judgment to defendants on these claims, we **AFFIRM**.

Wayne County DHS, as the entity asserting entitlement to sovereign immunity, bears the burden of showing that it is in fact an arm of the state. *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010). Whether Wayne County DHS is an "arm of the state" turns on four factors: (1) the State of Michigan's "potential legal liability for a judgment against" Wayne County DHS; (2) "the language employed by state courts and state statutes to describe" Wayne County DHS, "as well as the degree of control and veto power which the state has over" Wayne County DHS; (3) "whether state or local entities appoint

[Wayne County DHS] board members"; and (4) "whether [Wayne County DHS's] functions fall under the traditional purview of state or local government." *Id.* at 325.

"The state's potential legal liability for a judgment against the defendant 'is the foremost factor' to consider in our sovereign immunity analysis." *Id.* (quoting *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005)). Here, state law strongly suggests, although perhaps does not conclusively establish, that the State of Michigan would be responsible for judgments entered against Wayne County DHS. To start, the Michigan legislature abolished county departments of social services in 1975 and replaced them with a single statewide Department of Human Services (formerly called the Family Independence Agency). *See* Mich. Comp. Laws §§ 401.1 *et seq*. Numerous district courts have thereby concluded that county-level "child protective services offices are therefore not county agencies, but are merely local offices of the state DHS." *See, e.g.*, *Bradford v. Child Protective Servs. of Mich. Genesee Cty.*, No. 12-CV-13718, 2013 WL 4084756, at *4 (E.D. Mich. Aug. 13, 2013). Given that county DHS offices are merely local subdivisions of the state DHS, and given that state agencies are required to pay for court judgments, it follows that the State of Michigan—and not Wayne County—is liable for judgments against Wayne County DHS. *See* Mich. Comp. Laws § 18.1396.

The second and third factors also point strongly in favor of treating Wayne County DHS as an arm of the state. Once the "county department of social services . . . [was] made structurally a part of the state department of social services," all employees of the county departments became employees of the state and became members of the state employees retirement system. Mich. Att'y Gen. Op. 4973 (Apr. 16, 1976). The state allocates and distributes funding for county DHS offices, Mich. Comp. Laws §§ 400.14, 400.18, and Michigan DHS appoints the director, employees, and assistants of each county DHS office, *id.* § 400.45. Moreover, the state director of social services appoints one of the three members of each county's board, *id.* § 400.46, and the state department director may organize up to three counties into a single administrative unit "for purposes of administrative efficiency." *Id.* § 400.48. Finally, although county DHS departments are responsible for investigating "matters pertaining to dependent, neglected, and delinquent children," *id.* § 400.55(h), the boards of the county DHS

offices must "cooperate" with Michigan DHS "in handling the welfare and relief problems and needs of the people of its county." *Id.* § 400.53.

As to the fourth factor, we conclude that Wayne County DHS's "functions cannot be characterized neatly as completely within the traditional purview of either local or state government." *Lowe*, 610 F.3d at 331–32. However, "because the other three relevant factors decidedly weigh" in favor of treating Wayne County DHS as an arm of the state, we hold that the district court's holding to this effect was proper. *See id.* at 332.

Seeking to bypass this conclusion, plaintiffs argue that Wayne County DHS waived its immunity defense by failing to brief the issue sufficiently in its initial motion for summary judgment. Appellant Br. at 29–30. Although a state agency may waive its sovereign immunity and consent to suit by voluntarily appearing and defending against the merits of a case in federal court, we have not required an agency to make a full-throated assertion of its immunity in its initial dealings with the court to avoid waiver. *See Boler v. Earley*, 865 F.3d 391, 410–11 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1281 (2018), *and cert. denied*, 138 S. Ct. 1285 (2018), *and cert. denied*, 138 S. Ct. 1294 (2018). In *Boler*, for instance, we held that the State of Michigan and various agencies had not waived their sovereign immunity when they argued against the merits of plaintiffs' motion for a preliminary injunction and submitted a joint statement of resolved and unresolved issues without mentioning sovereign immunity, and they did not invoke their sovereign immunity until after the district court prompted them to submit a supplemental brief of their jurisdictional arguments. *Id.* Given that Wayne County DHS undeniably invoked its sovereign immunity in its initial motion for summary judgment, and failed only to support adequately this invocation with sufficient argument or evidence, *see* R. 50 (Mot. for Summary J. at 20–21 (Page ID #309–10), we do not believe that Wayne County DHS waived the defense or consented to suit.

Finally, plaintiffs argue that the Eleventh Amendment does not apply to suits brought by a citizen against his own state for violations of the Fourteenth Amendment because (1) the Eleventh Amendment only bars suits by citizens of another state or a foreign county; and (2) plaintiffs could sue directly under the Due Process Clause of the Fourteenth Amendment, which "limits a state's sovereignty" with regard to due-process violations. Appellant Br. at 32.

This argument is wrong on both fronts.  First, as the Supreme Court has long recognized, the Eleventh Amendment protects states from suits by their own citizens.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 140–41 (1984).  Second, the Fourteenth Amendment does not create a private right of action; instead, "§ 1983 provides a cause of action for all citizens injured by an abridgement of th[e] protections" set forth in "the Equal Protection and Due Process Clauses of the Fourteenth Amendment."  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 611 (2008) (Stevens, J., dissenting) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 119–20 (1992)).  As "[§] 1983 does not abrogate Eleventh Amendment immunity," *Boler*, 865 F.3d at 410, sovereign immunity bars plaintiffs' claims against Wayne County DHS in this case.

**D.  Mia Wenk, Shevonne Trice, Heather Decormier-McFarland, Monica Sampson, Charlotte McGehee, and Joyce Lamar ("State Defendants")**

Several issues remain on appeal with respect to the individual State Defendants in their personal capacities.  We address first plaintiffs' federal-law claims and then address plaintiffs' state-law claims against the various State Defendants.

**1.  Plaintiffs' Fourth Amendment Claims Against Wenk, Sampson, and Lamar Concerning the Preparation, Submission, and Execution of the Removal Order**

In reviewing Brent's first amended complaint, the district court held that the individual State Defendants are entitled to absolute immunity from plaintiffs' claims under 42 U.S.C. § 1983 concerning "the preparation and submission of the removal petition to the Family Court . . ., the execution of the resulting order, and the giving of recommendations and testimony." R. 163 (Order at 35) (Page ID #4146).  "Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

Social workers are entitled to absolute immunity, "akin to the scope of absolute prosecutorial immunity," for conduct "intimately associated with the judicial phase of the criminal process."  *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011) (second quote quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  Put differently, "social workers are absolutely immune only when they are acting in their capacity as

*legal advocates*—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). The doctrine of absolute immunity applies even if social workers make knowingly false statements in the petition for a removal order and while advocating before the court. *Pittman*, 640 F.3d at 725–26.

Plaintiffs raise four objections to the district court's granting of absolute immunity to Wenk, Sampson, and Lamar. First, plaintiffs argue that these three defendants are not entitled to absolute immunity for their respective roles in petitioning for the removal order because the State Defendants failed to provide Brent with an impartial hearing before filing the petition. Appellant Br. at 20. Plaintiffs do not explain, however, how the alleged lack of a pre-petition hearing countermands the defendants' well-established right to immunity. We have previously rejected efforts to "circumvent" a social worker's absolute immunity for filing a petition "by stating a claim based on '[the social worker's] underlying action in failing to properly investigate'" the case. *Pittman*, 640 F.3d at 726 (citation omitted). To the extent that plaintiffs' argument hinges on such a claim, we reject it again here.

Next, plaintiffs insist that the State Defendants are not entitled to immunity for filing the petition because they submitted the petition to a probation officer, who allegedly rubber-stamped the order with a judge's signature, rather than to a judge or referee. Appellant Br. at 20. We understand this argument to be a misplaced effort to hold the State Defendants responsible for the Family Court's allegedly faulty procedures for reviewing and granting orders. As we have already held, plaintiffs cannot hold the social workers liable for decisions over which "the family court—not the State Defendants—bore the ultimate responsibility." *Brent*, 555 F. App'x at 529 (quotation marks omitted). Plaintiffs' second argument therefore also fails.

Third, plaintiffs contend that Wenk should not be immunized for her role as the "complaining witness" in support of the removal order. Appellant Br. at 20. Plaintiffs note that in the Fourth Amendment context, prosecutors who "vouch[] for the truth of the contents of [a] criminal complaint in front of a judicial officer" are entitled to qualified immunity, rather than absolute immunity, because they are acting more like a police officer seeking a warrant than a prosecutor presenting an indictment. *See Ireland v. Tunis*, 113 F.3d 1435, 1448 (6th Cir. 1997).

Because Wenk not only presented the petition for removal, but also vouched for the truthfulness of its contents, plaintiffs argue that the doctrine of qualified immunity governs her conduct. Appellant Br. at 20. Moreover, because Wenk allegedly submitted false information in the petition, plaintiffs contend that she must be denied qualified immunity. *Id.* (citing *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)).

True, we once held that a social worker could not receive absolute immunity for "the act of personally vouching for the truth of the facts that provide the evidentiary support for [the family court's] finding of probable cause." *Young v. Vega*, 574 F. App'x 684, 689 (6th Cir. 2014). *Young*, however, is unpublished and non-binding, and our later published precedent overrides *Young*'s holding. In *Barber v. Miller*, 809 F.3d 840 (6th Cir. 2015), for instance, we held that a social worker is entitled to absolute immunity against allegations that he "included false and misleading statements of fact in the protective-custody petition." *Id.* at 844. As we explained then, the social worker "offered his factual assessment in his capacity as a legal advocate initiating a child-custody proceeding in family court." *Id.* Because a petition for a removal order triggers a subsequent hearing in court, *see* Mich. Ct. R. 3.963(B)(1)(b), 3.965, a social worker's actions as a complaining witness are "more analogous to a prosecutor's decision to prosecute than a police officer's testifying by affidavit in support of probable cause." *Bauch v. Richland Cty. Children Servs.*, No. 17-3435, 733 F. App'x 292, 2018 WL 2338906, at *4 (6th Cir. May 23, 2018). The district court therefore did not err in granting absolute immunity to Wenk for serving as the "complaining witness" in support of the removal order.

Finally, plaintiffs argue that Wenk is not entitled to absolute immunity for her role in executing the removal order on February 18, 2017. Appellant Br. at 21–22. On this point we agree. Social workers are entitled only to qualified immunity when removing children from a home because, in such circumstances, the social workers are "acting in a police capacity rather than as legal advocates." *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013). Thus, if Wenk violated plaintiffs' clearly established constitutional rights when executing the removal order, she would not be entitled to qualified immunity from plaintiffs' claims. *See id.* at 695.

Plaintiffs first argue that Wenk violated clearly established law by executing a removal order that she knew to contain falsehoods, in contravention of the well-established Fourth Amendment principle that an officer "cannot rely on a judicial determination of probable cause" to justify executing a warrant "if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (quoting *Yancey*, 876 F.2d at 1243). Though we entirely agree—and now directly hold—that a social worker, like a police officer, cannot execute a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order, this principle was not clearly established at the time Wenk executed the order in this case. Indeed, we held as recently as 2015 that "general assertions that 'the Fourth Amendment was violated as to [a child] when he was seized pursuant to [an] order' that he claims 'was based on false statements and otherwise lacked probable cause' invoke no clearly established right." *Barber*, 809 F.3d at 848. As *Barber* concerned conduct that occurred after the allegedly unlawful actions in this case, *see id.* at 842, we must grant Wenk qualified immunity here.

Plaintiffs next argue that Wenk violated clearly established law by executing a facially invalid warrant. However, plaintiffs did not include allegations of facial invalidity in the then-operative first amended complaint, and therefore the district court properly declined to consider the allegation when it was raised for the first time in a motion for reconsideration. *See* R. 199 (Order at 16) (Page ID #4774). In any event, as we explain further below, the warrant did not contain such "glaring deficienc[ies]" such that no reasonable social worker could have reasonably executed it. *Groh v. Ramirez*, 540 U.S. 551, 564 (2004). Wenk is therefore entitled to qualified immunity under this theory of liability, as well.

### 2. Robert's Fourth Amendment Claims Against Wenk, Sampson, and Decormier-McFarland Concerning the January 20, 2010 and January 21, 2010 Home Visits

In his initial complaint, Brent alleged that Wenk, Sampson, and Decormier-McFarland violated his Fourth Amendment rights when they interrogated his children and took photographs of his home without his consent. *See Brent*, 555 F. App'x at 524. The district court initially denied the social workers qualified immunity as to these allegations, but we reversed on appeal.

*Id.* at 524–27.  We held that the social workers had not violated clearly established law "by exceeding the limited consent to search that [Brent] had given them," and we thereby held that the social workers were entitled to qualified immunity.  *Id.*  When the district court subsequently allowed Robert to join the case as plaintiff, it barred Robert from bringing Fourth Amendment claims against Wenk, Sampson, and Decormier-McFarland concerning their alleged "warrantless seizure[s]" and "custodial interrogations" of Robert on January 20 and 21, 2010.  R. 221 (Order at 32–33) (Page ID #5159–60).  According to the district court, "no controlling precedent [holds] . . . that a social worker's questioning of Robert Brent without parental consent violated his clearly established rights."  *Id.* at 33 (Page ID #5160).  Accordingly, the district court held that allowing Robert to assert his Fourth Amendment claims in the second amended complaint would be "futil[e]" because "there would still be qualified immunity on these issues."  *Id.*  As noted above, we review de novo a district court's conclusions on grounds of futility that proposed amendments to a complaint could not survive a motion to dismiss.  *Associated Truck Lines*, 801 F.2d at 248.  We now **AFFIRM**.

Robert's allegations against the individual State Defendants are as follows:  On January 20, 2010, Brent gave Wenk limited consent to talk to Robert in the Brents' living room to make sure he was all right after having been outside in the middle of winter wearing only shorts.  R. 222 (Second Am. Compl. at 6) (Page ID #5175).  Once Wenk started asking Robert questions that "went beyond the consent given," Wenk demanded that she be allowed to talk to Robert alone in his bedroom and told the Brents that they could not object "because the law authorized her actions."  *Id.*  After "concluding her interrogation[]," Wenk "ordered" Robert to show her the rest of the house, including areas where he was not allowed to go, such as the basement and his brother's room.  *Id.* at 7 (Page ID #5176).  The next day, Wenk, Sampson, and Decormier-McFarland returned to the home to ask Robert "a couple of questions."  *Id.* at 8.  Sampson "demanded" that Robert escort the three social workers upstairs.  *Id.* at 26 (Page ID #5196).  Plaintiffs make no further allegations about defendants' interactions with Robert on January 21, 2010.

These allegations, taken as true, do not amount to a violation of clearly established Fourth Amendment law.  Undeniably, clearly established law prohibits the unreasonable seizure of a

minor by state social workers.  *See Kovacic*, 724 F.3d at 699.  It is not at all clear, however, that Robert was seized during the January 20 or the January 21 home visits.  "To determine whether a person has been seized within the meaning of the Fourth Amendment, the inquiry is whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)).  In *Myers*, the principal case upon which plaintiffs rely, we held that a fourteen-year-old boy was seized under the Fourth Amendment when he was removed from his mother's home, taken to a district attorney's office an hour away after his mother was falsely told he would be taken only a few miles away, and interrogated for over four hours (even though the officers had told his mother that he would be back home within the hour).  *Id.* at 350, 355–57.  In such circumstances, we concluded that the boy could not have reasonably believed that he could leave, particularly since he was questioned in an office with "the doors were locked behind him" and his repeated requests to be taken home were "expressly declined."  *Id.* at 355.

The alleged facts of this case are palpably different.  For one thing, the social workers never removed Robert from his home, rendering it far less likely that Robert felt unable to "leave" their presence.  *Cf. United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009) (holding, in the *Miranda* context, that "in-home encounter[s] between the police and a citizen generally will be non-custodial").  In addition, plaintiffs never allege that Robert declined to speak with the social workers or asked not to be interviewed.  Even assuming Wenk told the parents they could not object to the questioning, as plaintiffs allege, there is no indication that Wenk told Robert he was required to speak with her.  *See id.* at 467 (holding defendant was not in custody when she was never told "that she could not ask the investigators to leave or that she was required to answer their questions").  Indeed, plaintiffs' sole effort to show that the "encounters [were] involuntary" is to argue that "after attempts to end the interrogation were denied, Robert became very emotional"—a factual assertion that appears nowhere in plaintiffs' twice-amended complaint.  *See* Appellant Br. at 28.  Taken all together, we cannot conclude from plaintiffs' operative complaint that Robert was seized—let alone that he was seized in violation of clearly established law.  We therefore affirm the district court's refusal to allow Robert to assert § 1983

claims based on purported Fourth Amendment violations against Wenk, Sampson, or Decormier-McFarland in plaintiffs' second amended complaint.

### 3. Plaintiffs' State Constitutional Claims Against Wenk and Sampson

In their proposed second amended complaint, plaintiffs also attempted to bring claims arising from the Michigan Constitution against Wenk and Sampson.[4] In particular, plaintiffs alleged that the social workers violated plaintiffs' rights under Article I §§ 2, 6, 9, 11, 17, and 23 of the Michigan Constitution. R. 211 (Proposed Second Am. Compl. at 22, 31–32) (Page ID #5011, 5020–21). The district court properly barred plaintiffs from asserting these claims. *See* R. 221 (Order at 27–29) (Page ID #5154–56). Under Michigan law, plaintiffs may not bring suits for damages against individual government employees for alleged violations of the Michigan Constitution. *Jones v. Powell*, 612 N.W.2d 423, 426 (Mich. 2000). Plaintiffs resist his rule, arguing that they are not alleging claims directly under the Michigan Constitution, but are instead suing for violations of Michigan's Child Protection statute, which requires "[a]ll department employees involved in investigating child abuse or child neglect cases [to] be trained in the legal duties to protect the state and federal constitutional and statutory rights of children and families from the initial contact of an investigation through the time services are provided." Mich. Comp. Laws § 722.628(17). Michigan courts have never interpreted this provision of the Child Protection laws, let alone decided that the provision creates a private right of action. As plaintiffs offer no argument or case law in support of inferring a private right of action, we decline to do so. *See Hertel v. Mortg. Elec. Registration Sys., Inc.*, No. 1:12-CV-174, 2013 WL 1874718, at *5 (W.D. Mich. May 3, 2013) ("[F]ederal courts are justifiably reluctant to find implied causes of action in state statutes due to federalism concerns."). We therefore **AFFIRM**.

### 4. Robert's State-Law Failure-to-Report Claim Against Trice

Robert brought a medical-neglect claim against Trice in plaintiffs' second amended complaint. In particular, Robert alleged that he was given expired medication while he was

---

[4]The district court believed that plaintiffs were also bringing claims under the Michigan Constitution against Trice, but we do not see any such claims in either the proposed second amended complaint or the second amended complaint. In any event, our holding here applies equally to plaintiffs' potential claims under the Michigan Constitution against Trice.

under the care of Methodist. R. 222 (Second Am. Compl. at 41) (Page ID #5211). Robert's parents learned about this incident during a family visit on April 14, 2010 and immediately reported it to Trice, who was present at the time. *Id.* Trice, however, "ignored her affirmative duty to report this medical neglect." *Id.* Two days later, Robert began coughing up blood and asked Methodist to see a doctor. *Id.* at 57 (Page ID #5227). After his requests to see a physician were repeatedly denied, Robert left Methodist and went to a hospital, where he was diagnosed with acute bronchitis and acute pharyngitis. *Id.* A Foster Care Review hearing was subsequently held on April 26, 2010, during which time "it was determined . . . that the medical neglect of R. Brent must be reported and investigated." *Id.* at 42 (Page ID #5212). Nevertheless, Trice, who was present at the meeting, "still refused to report" the allegedly ongoing "medical neglect of R. Brent." *Id.* Robert sued Trice for failing to report his medical neglect and sought damages, "including but not limited to medical expenses and emotional distress." *Id.* at 46 (Page ID #5216).

Trice responded to Robert's allegations by claiming immunity under the Governmental Tort Liability Act ("GTLA"), Michigan Compiled Laws § 691.1407. *See* R. 230 (Mot. for J. on the Pleadings at 10–12) (Page ID #5318–20). In Michigan, "[g]overnmental employees bear the burden of raising and proving their entitlement to immunity as an affirmative defense." *Gohl v. Turbiak*, No. 335389, 2018 WL 2067796, at *5 (Mich. Ct. App. May 3, 2018). The GTLA immunizes officers and employees of governmental agencies from tort liability for injuries arising out of negligence if:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2). The GTLA does not immunize officials from intentional-tort claims, *id.* § 691.1407(3), although common-law immunity precludes suits against government officials for intentional torts under certain circumstances. *Odom*, 760 N.W.2d at 228. Thus, by

asserting immunity under the GTLA, Trice necessarily interpreted plaintiffs' failure-to-report claim as sounding in negligence.

Although the district court initially rejected Trice's GTLA defense, *see* R. 249 (Order at 7–10) (Page ID #5517–20), it ultimately held that Trice was entitled to governmental immunity because her failure to report medical neglect was not the proximate cause of Robert's injuries, *see* R. 261 (Order at 6–7) (Page ID #5653–54). In so holding, the district court reasoned that Robert's injuries were caused "most immediately by other factors"—i.e., either "the illness itself or perhaps the expired medication." *Id.* at 7 (Page ID #5654). The district court therefore entered judgment on the pleadings in favor of Trice on Robert's failure-to-report claim—a determination that we now review de novo. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). In so doing, we treat "all well-pleaded material allegations of the pleadings of the opposing party" as true, and we will affirm the granting of a Rule 12(c) motion "only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).

On appeal, plaintiffs do not challenge the district court's proximate-cause determination. Instead plaintiffs argue that Trice is not entitled to immunity because she has not established that she was acting within the scope of her authority, as required to secure immunity under the GTLA. *See* Appellant Br. at 25. Alternatively, plaintiffs argue that Trice's failure to report may have been intentional instead of negligent, and that she was not entitled to immunity under the standard set forth in *Odom*. We address each argument in turn.

We reject plaintiffs' first argument. Michigan courts define the "scope of authority" as "[t]he reasonable power that an agent has been delegated or might foreseeably be delegated in carrying out the principal's business." *Backus v. Kauffman*, 605 N.W.2d 690, 694 (Mich. Ct. App. 1999) (quoting Black's Law Dictionary (7th ed.) at 1348). As a social worker, Trice is required under Michigan law to report child abuse or child neglect when she "has reasonable cause to suspect" such abuse or neglect. Mich. Comp. Laws § 722.623. Trice therefore acts within the scope of her authority when she reports reasonable suspicions of abuse and neglect, as well as when she declines to report cases where there is "no reasonable cause" to suspect abuse or neglect. Accordingly, Trice necessarily acted within the scope of her authority when she

decided—either rightly or wrongly—not to report the alleged medical neglect here. This conclusion is all the more apparent here given that Trice learned about Methodist's alleged misconduct while acting as a social worker (i.e., attending a family visit and participating in a Foster Care Review hearing). *See* State Defendants Br. at 31. We therefore affirm the district court's grant of immunity.

We also reject plaintiffs' attempt to assert for the first time that Trice may have intentionally, rather than negligently, failed to report Methodist's medical neglect. It is entirely unclear from plaintiffs' second amended complaint whether Robert's failure-to-report claim alleges an intentional tort or negligence. *See* R. 222 (Second Am. Compl. at 46) (Page ID #5216) ("Ms. Trice is liable to Plaintiff R. Brent under MCL 722.633(1) for the damages caused from her failure to report the medical and educational neglect of Plaintiff R. Brent, including but not limited to medical expenses and emotional distress caused by her failure."). In response to the State Defendants' motion for judgment on the pleadings, however, plaintiffs stressed that Trice's conduct had been "grossly negligen[t]" and made no mention of a potential intentional tort. *See* R. 235 (Pls. Response to State Defs.' Mot. for J. on the Pleadings at 12) (Page ID #5372). Plaintiffs may not now reinterpret their complaint for the first time on appeal to raise a claim that they never before asserted. *Cf. Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1195 (6th Cir. 1995) (holding that we generally "decline to review a claim that is presented for the first time on appeal").

We therefore **AFFIRM** the district court's grant of judgment on the pleadings in favor of Trice with respect to Robert's failure-to-report claim.

### 5. Plaintiffs' State-Law Claims (IIED and Eavesdropping) Against the State Defendants

The procedural history of plaintiffs' state-law claims against the State Defendants, as recounted on pages 9–11, supra, is complicated. In short, the district court initially determined that the State Defendants were absolutely immune under state law from plaintiffs' IIED and eavesdropping claims under *Martin v. Children's Aid Soc.*, 544 N.W.2d 651 (Mich. 1996), R. 249 (Order at 3–10) (Page ID #5513–20), then reversed itself following plaintiffs' motion for reconsideration, R. 261 (Order at 3–8) (Page ID #5650–55), and then reversed itself again,

R. 270 (Order at 6) (Page ID #5725).  In the meantime, the individual State Defendants had appealed the district court's prior holding that defendants were *not* entitled to absolute immunity. R. 265 (Notice of Appeal at 2) (Page ID #5676).  Thus, we now have before us the State Defendants' appeal from the district court's denial of absolute immunity, as well as plaintiffs' appeal from the district court's subsequent granting of such immunity.

We conclude that the district court's denial of the State Defendants' absolute-immunity defense was immediately appealable, such that we have jurisdiction over the appeal docketed in 17-1428.  As a result, the district court lacked jurisdiction subsequently to reverse its order denying immunity after the State Defendants had filed a notice of appeal.  Nevertheless, we agree with the district court's ultimate conclusion that the State Defendants are entitled to absolute immunity from plaintiffs' state law claims under *Martin*, and we therefore **REVERSE** the district court's decision denying immunity and **REMAND** with instructions to (re-enter) judgment in defendants' favor.

### a. Jurisdiction

We have jurisdiction to consider the State Defendants' interlocutory appeal of the district court's denial of absolute immunity under *Martin*, though not for the reason the State Defendants suggest.  The State Defendants rely on *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), to support their claim that "[t]he denial of state-law immunity is immediately appealable."  17, 1428, D.E. 9 (Defs.' Response to Mot. to Dismiss for Lack of Jurisdiction at 7). *Livermore*, however, concerns the appealability of orders denying immunity under Michigan's governmental immunity statute, Michigan Compiled Laws § 691.1407.  *See* 476 F.3d at 407–08. As the Michigan courts have held, and as the State Defendants have repeatedly stressed in this case, *Martin* immunity "does not arise from this kind of statute."  544 N.W.2d at 655 n.5.  Our decision in *Livermore* therefore does not control this case.

"[W]e must look to state immunity law to determine if a denial of immunity based on state law is appealable."  *Walton v. City of Southfield*, 995 F.2d 1331, 1343 (6th Cir. 1993), *superseded by statute on other grounds as recognized in Livermore*, 476 F.3d 397.  As we have long recognized,

the right to an interlocutory appeal from the denial of a claim of absolute or qualified immunity under state law can only exist where the state has extended an underlying substantive right to the defendant official to be free from the burdens of litigation arising from acts taken in the course of his duties.

*Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172 (6th Cir. 1986), *superseded by statute on other grounds as recognized in Bradley v. City of Ferndale*, 148 F. App'x 499, 512 (6th Cir. 2005). We have thus distinguished between state-immunity laws that provide only immunity from liability, rather than immunity from suit. *Id.* at 172–74. Where a state is focused solely on protecting officials from "the risk of ultimate liability in damages," we have concluded that the officials have no "entitlement not to stand trial" and therefore no right to an interlocutory appeal. *Id.* at 172, 174. Where, however, a state is not concerned only with liability for money damages, but also "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," we will conclude that the state intended to immunize its officials from suit and therefore intended to authorize interlocutory appeals from the denial of such immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)); *see also Marrical*, 805 F.2d at 172–74.

When the Michigan Court of Appeals held in *Martin* that social workers must receive absolute immunity for their role in "initiating and monitoring child placement proceedings and placements," it was focused on far more than just immunity from money damages. In justifying its decision, the Michigan Court of Appeals explained that "social workers must be allowed to act without fear of intimidating or harassing lawsuits by dissatisfied or angry parents." *Martin*, 544 N.W.2d at 655. The court further explained that "absolute immunity is necessary to assure that our important child protection system can continue to function effectively" and to "[]serve the broader public interest in having participants [in contested child protection cases] . . . perform their respective functions without fear of having to defend their actions in a civil lawsuit." *Id.* at 655–56 (second quote quoting *Babcock v. Tyler*, 884 F.2d 497, 502 (9th Cir. 1989)) (alteration and omission in original). And the court deemed "persuasive" the *Martin* defendants argument that "[t]he threat of a suit . . . could make any social worker back off from making discretionary decisions that he or she would otherwise believe to be in the child's best interests." *Id.* at 656

(quotation marks and citation omitted). These rationales mirror the concerns the Supreme Court highlighted in *Forsyth* as evidence that qualified immunity under federal law is "immunity from suit." *See* 472 U.S. at 526–27. We therefore conclude, like the Court in *Forsyth*, that the entitlement under *Martin* "is an *immunity from suit* rather than a mere defense to liability." *Id.* at 526. Accordingly, the denial of absolute immunity under *Martin* is immediately appealable as a collateral order.

Plaintiffs resist this holding, arguing that the list of "final order[s]" subject to appeal of right in the Michigan Court Rules includes orders denying governmental immunity, but does not include orders denying immunity under *Martin*. *See* Mich. Ct. R. 7.203(A), 7.202(6)(a)(v). The trouble for plaintiffs, however, is that the Michigan Court Rules also authorize appeal of right from "[a] judgment or order of a court or tribunal from which appeal of right to the Court of Appeals has been established by law or court rule," Mich. Ct. R. 7.203(A)(2), and we determine whether appealability "has been established by [state] law" by applying the analysis set forth in *Marrical* and *Walton*. Sometimes, of course, our determination must change in light of intervening state law. In *Walton*, for instance, we held that orders denying governmental immunity are not immediately appealable under Michigan law, a decision we later reversed when Michigan amended its Court Rules in 2002 to identify expressly orders denying governmental immunity as "final orders" available for appeal of right. *See Livermore*, 476 F.3d at 408. But this does not mean that the process for "determining whether we may hear an appeal based on state-law immunity" has changed. *See Schack v. City of Taylor*, 177 F. App'x 469, 473 (6th Cir. 2006) (holding that we have jurisdiction to hear interlocutory appeals of orders denying governmental immunity given Michigan's amendments to its Court Rules, but recognizing that, in general, we still determine whether we can hear interlocutory appeals based on state-law immunity by asking whether "the state has extended an underlying substantive right to the defendant official to be free from the burdens of litigation" (quoting *Marrical*, 805 F.2d at 172)). Though the Michigan courts have not decided this issue, we conclude based on our precedent that orders denying *Martin* immunity are immediately appealable under state law.

Because the district court's denial of *Martin* immunity to the State Defendants was immediately appealable, the district court lost jurisdiction over the plaintiffs' state-law claims

against the State Defendants once the State Defendants filed their notice of appeal. *See Lewis v. Alexander*, 987 F.2d 392, 394 (6th Cir. 1993). The district court concluded otherwise, reasoning that this court had already affirmed the district court's predecessor's decision to deny the State Defendants absolute immunity. *See* R. 264 (Order at 4 n.1) (Page ID #5671). While true that "the district court retains jurisdiction over an action when an 'appeal is untimely, is an appeal from a non-appealable non-final order, or raises only issues that were previously ruled upon in that case by the appellate court,'" *Lewis*, 987 F.2d at 394–95 (quoting *Rucker v. U.S. Dep't of Labor*, 798 F.2d 891, 892 (6th Cir. 1986)), the district court erred in holding that this court had already decided that the State Defendants were not entitled to immunity under *Martin*. We previously held that the State Defendants were not entitled to governmental immunity under the GTLA or *Odom*. Brent, 555 F. App'x at 535. We never considered, however, whether the State Defendants were entitled to absolute immunity under *Martin*. The district court therefore had no power to revisit the claims that were pending before this court on appeal.[5]

### b. Waiver

Plaintiffs argue that even if we have jurisdiction to hear the State Defendants' appeal, we should hold that the State Defendants have waived their immunity defense under *Martin* by failing to raise this defense in a timely fashion. We decline plaintiffs' invitation.

As noted above, absolute immunity under *Martin* is an affirmative defense under Michigan law, and it can be waived in federal court if it is not asserted in defendants' first responsive pleading. *See* section II.B.3, supra. Here, the State Defendants did raise state-law absolute immunity in their first responsive pleading. *See* R. 200 (Answer at 6) (Page ID #4782); *see also* R. 225 (Answer at 5) (Page ID #5276). They did not, however, raise state-law absolute immunity in their pre-answer motion to dismiss. As we have previously held that defendants

---

[5]Plaintiffs insist that we lack jurisdiction because the State Defendants' appeal is untimely, in that the district court had purportedly decided that the State Defendants were not entitled to *Martin* immunity on November 15, 2012, and the State Defendants never appealed that order. *See* 17-1428, Appellee Br. at 15. Plaintiffs are wrong. By November 2012 order, the State Defendants had not yet raised immunity under *Martin*—only the Children's Center had. Moreover, although the district court held that the Children's Center was not entitled to state-law immunity in its November 15, 2012 order, it subsequently revisited its decision and held that the Children's Center was entitled to *Martin* immunity, *see* R. 199 (Order at 10–13) (Page ID #4768–71). We therefore reject plaintiffs' arguments on this point.

may assert immunity defenses for the first time in post-answer dispositive motions, even if they previously failed to raise those same defenses in pre-answer dispositive motions, *see English v. Dyke*, 23 F.3d 1086, 1091 (6th Cir. 1994), plaintiffs must believe that *English* does not decide this case. We disagree.

In *English*, we held that Federal Rule of Civil Procedure 12(g) does not require defendants to assert federal qualified immunity in their pre-answer motions to dismiss because qualified-immunity defenses essentially state that the plaintiff has failed to state a claim, and a defense based on failure to state a claim need not be brought in a defendant's first motion, but instead "may be brought in a subsequent pleading, motion for judgment on the pleadings, or at trial on the merits." *Id.* Plaintiffs here argue that the Michigan court rules operate differently and require defendants to argue immunity defenses in their first dispositive motion or else waive the defense. *See* 17-1428, Appellee Br. at 27. We read Michigan's rules differently. *See* Mich. Ct. R. § 2.116(C)(7), (D)(2). In any event, federal law governs questions of federal procedure, and our holding in *English* therefore governs this case. *See Roskam*, 288 F.3d at 901.

Plaintiffs seemingly also argue that the State Defendants waived their defense under *Martin* by filing their answer to plaintiffs' first amended complaint tardily and by filing repeated motions for extensions. *See* 17-1428, Appellee Br. at 17–18. We review for abuse of discretion a district court's determination that an untimely assertion of an affirmative defense was permissible because it "did not result in surprise or unfair prejudice" to plaintiffs. *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). We see no "clear error of judgment" here and therefore affirm. *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989).

### c. Merits

Plaintiffs recognize that *Martin* immunity is broad but nonetheless raise several arguments for its inapplicability here. First, plaintiffs insist that *Martin* immunity does not apply to activities taken before a petition for child removal is filed, as those activities take place without judicial oversight. 17-1428, Appellee Br. at 20–21. As Michigan courts have held otherwise, we reject this argument. *See McCarthy*, 2009 WL 3235639, at *7 (holding that

*Martin* immunity "appl[ies] with equal force to the pre-adjudication investigatory stages of a child protective proceeding," as "this might well be the most volatile stage of the proceeding").

Second, plaintiffs contend that Decormier-McFarland is not entitled to immunity under *Martin* because she was an intern with Wayne County DHS, rather than a paid employee. Plaintiffs offer no case law in support of their position, and we decline to limit Michigan law without some sort of evidence that the Michigan courts intended such a limitation to apply. *Cf. Rehm v. Interstate Motor Freight Sys.*, 133 F.2d 154, 157 (6th Cir. 1943) ("[When dealing with issues of state law,] the duty of United States courts . . . is to ascertain, construe and apply static state law:  not to limit, modify or repeal state doctrine.").

Third, plaintiffs argue that the GTLA forecloses *Martin* immunity for governmental employees.  As Michigan courts have granted immunity under *Martin* to governmental employees, we see no basis for adopting plaintiffs' interpretation.  *See McCarthy*, 2009 WL 3235639, *4–6 (granting both governmental immunity and *Martin* immunity to a Children's Protective Services employee).

Finally, plaintiffs argue that Trice is not entitled to *Martin* immunity for drafting a document naming Michael and Noel Chinavare temporary guardians of Brent's male children without first obtaining a court order authorizing the guardianship.  *See* R. 222 (Second Am. Compl. at 36) (Page ID #5206).  As there was no "court oversight" over this decision, plaintiffs reason that *Martin* immunity cannot apply.  *See* 17-1428, Appellee Br. at 24–25.  This argument misunderstands the breadth and the purpose of *Martin* immunity.  If the Brents were displeased with Trice's allegedly wrongful behavior, they could have "avail[ed] themselves of the safeguards built into the adjudication process." *McCarthy*, 2009 WL 3235639, at *6.  *Martin* immunity does not stop applying simply because the court did not pre-approve or "oversee every discrete act of the social worker." *Beauford v. Lewis*, 711 N.W.2d 783, 785 (Mich. Ct. App. 2005).

Thus, we conclude that the district court erred in denying the State Defendants absolute immunity under *Martin* from plaintiffs' IIED and eavesdropping claims (though we recognize, of

course, that the district court subsequently reached the same resolution as we now do).  We therefore grant the State Defendants absolute immunity as to these claims.

**E.  City of Detroit, Emina Biogradlija, and Michael Bridson ("The City Defendants")**

In their second amended complaint, plaintiffs alleged that the City of Detroit, Detroit Police Officers Emina Biogradlija and Michael Bridson, and two other unknown Officers violated plaintiffs' Fourth and Fourteenth Amendment rights when they entered plaintiffs' home without a valid warrant and removed plaintiffs' children, in violation of 42 U.S.C. § 1983.  R. 222 (Second Am. Compl. at 55) (Page ID #5225).  Plaintiffs also claimed that the City Defendants intentionally caused plaintiffs emotional distress by forcibly entering plaintiffs' home, using excessive force to remove plaintiffs' children, and physically assaulting Brent.  *Id.* Finally, plaintiffs insisted that the Detroit Police Department was grossly negligent in its training and supervision of its police officers.  *Id.* at 55–56 (Page ID #5225–26).  The City Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), and the district court granted judgment in the City Defendants' favor as to all claims.  R. 250 (Order) (Page ID #5522–33).  We now **AFFIRM**.[6]

**1.  Jurisdiction and Standard of Review**

As a preliminary matter, the City Defendants argue that this court lacks jurisdiction over plaintiffs' appeal because the district court entered final judgment in this case on May 1, 2017, R. 271 (Judgment) (Page ID #5727–28), and plaintiffs did not file a notice of appeal until July 7, 2017, R. 281 (Notice of Appeal) (Page ID #5844).  Although plaintiffs typically must file a notice of appeal in a civil case within 30 days after entry of the final judgment, Federal Rule of Appellate Procedure 4(a)(4) provides that if a motion is filed within twenty-eight days of entry of judgment under Rule 59 or Rule 60 by "*a* party," then "the time to file an appeal runs for *all* parties from the entry of the order disposing of the last such remaining motion."  FED. R. APP. P. 4(a)(1)(A), (a)(4) (emphasis added).  Here, plaintiffs moved to vacate the entry of judgment as to

---

[6]Plaintiffs also alleged that the City Defendants conspired to violate Plaintiffs' Fourth and Fourteenth Amendment rights with the Wayne County Department of Health Services and social worker Mia Wenk, in violation of 42 U.S.C. § 1985.  R. 222 (Second Am. Compl. at 55) (Page ID #5225).  The district court entered judgment on the pleadings in favor of defendants on this claim, and plaintiffs have not appealed this decision.

the State Defendants under Federal Rules of Civil Procedure 59 and 60 and Local Rule 7.1 on May 4, 2017. R. 272 (Pls.' Mot. to Vacate Void Orders) (Page ID #5730). This motion was denied on June 9, 2017. R. 280 (Order at 4) (Page ID #5842). Plaintiffs' July 7, 2017 notice of appeal is therefore timely as to all parties, and this court has jurisdiction to hear plaintiffs' appeal vis-à-vis the City Defendants.

As noted above, we review de novo a judgment on the pleadings under Rule 12(c). *Fritz*, 592 F.3d at 722. Where, as here, defendants have attached exhibits to their motion for judgment on the pleadings, we may consider those exhibits "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### 2. Section 1983

The district court properly entered judgment on plaintiffs' claims under 42 U.S.C. § 1983. Government officials cannot be held liable under § 1983 unless they violate a plaintiff's clearly established constitutional rights. *Kovacic*, 724 F.3d at 695. In other words, an officer is immune from suit for constitutional violations unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Groh*, 540 U.S. at 563 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Under clearly established Fourth-Amendment law, "government officials must obtain a warrant to conduct a search or seizure on private property, absent exigent circumstances or another recognized exception." *Kovacic*, 724 F.3d at 698.[7] Here, the City Defendants entered plaintiffs' home and removed Brent's children pursuant to an "Order to Take Children into Protective Custody" signed by a state family-court judge. R. 231-2 (Order) (Page ID #2427–28). Plaintiffs correctly assume that this removal order was equivalent to a judicially authorized warrant. *See* R. 222 (Second Am. Compl. at 54) (Page ID #5224); *see also Young*, 574 F. App'x

---

[7]Though plaintiffs' complaint alleges violations of the Fourth and Fourteenth Amendments, the district court assumed that plaintiffs intended to raise claims only under the Fourth Amendment, as incorporated against the states through the Fourteenth Amendment. R. 250 (Order at 3–4) (Page ID #5524–25). As plaintiffs have not challenged this assumption on appeal, we will assume that the district court correctly interpreted plaintiffs' complaint.

at 692 (describing an ex parte order authorizing the Tennessee Department of Children's Services to take emergency temporary custody of children as "a judicially secured arrest warrant"); *J.B. v. Washington Cty.*, 127 F.3d 919, 930 (10th Cir. 1997) (holding that a judge's "order to take [a child] to a shelter home was tantamount to an arrest warrant issued by a magistrate"). Plaintiffs argue, however, that the City Defendants were not entitled to rely on the removal order because it was "so facially deficient . . . that the executing officers [could] not reasonably presume it to be valid." *Groh*, 540 U.S. at 565 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)); *see also* Appellant Br. at 34–35. In particular, plaintiffs allege that the order (1) did not have a court seal; (2) did not have a judge's name on the first page; (3) was signed with a "rubber stamp"; (4) "had the wrong description for all of Plaintiff's children; (5) included "contradictory statement[s] regarding 'reasonable efforts'"; (6) "did not specify who was authorized to execute it"; (7) had "no date of entry of order" and "no hearing date set," and (8) "gave blanket permission to enter premises *anywhere* in the United States." R. 222 (Second Am. Compl. at 54) (Page ID #5224).

Some of plaintiffs' allegations fail on the facts. For instance, plaintiffs do not specify what is "wrong" about the order's description of the children, and we see no obvious error. *See* R. 231-2 (Order to Take Children into Protective Custody at 1) (Page ID #5351) (identifying each child by his or her name and birthday).[8] Other allegations are legally insignificant. The order is not deficient, for example, simply because it authorizes entry into plaintiffs' home or wherever the children are "reasonably believed to be found." *Id.* at 2 (Page ID #5352). Though the final catch-all phrase was overbroad, "an 'infirmity due to overbreadth does not doom the entire warrant.'" *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018) (quoting *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001)). Where a warrant contains "sufficiently particularized" portions that are "distinguishable from the invalid portions" and that "make up the greater part of the warrant," the proper portions of the warrant "remain[] valid." *Id.* at 966 (quoting *United States v. Sells*, 463 F.3d 1148, 1151 (10th Cir. 2006)). Nor are we aware of any constitutional requirement that warrants (or child removal orders) must include court seals, the

---

[8]We may review the removal order, which the City Defendants attached to their Rule 12(c) motion, because the contents of the order are central to plaintiffs' claims. *See Bassett*, 528 F.3d at 430.

name of the issuing judge on the first page, a preliminary hearing date,[9] or a handwritten as opposed to a stamped signature.

Moreover, even if the removal order contained some irregularities, plaintiffs have failed to establish that these flaws rendered the officers' reliance on the warrant objectively unreasonable. For instance, the field where the judge or referee was supposed to fill in the "[d]ate of entry of order" was left blank, but the order was stamped with a "Filed" date of February 18, 2010, and the order included an expiration date of March 18, 2010. *See* R. 231-2 (Removal Order at 1–2) (Page ID #2427–28). In addition, though the checkmark box indicating that reasonable efforts were not made to avoid removal was ticked, it was plain from the face of the warrant that this tick mark was a typographical error, as the checkmark box indicating that reasonable efforts *were* made to avoid removal was also ticked, and the order included a short narrative detailing those efforts. *Id.* Finally, though the order failed to identify the executing officers, this is "precisely the kind of technical error[s] in an otherwise valid warrant which fails to raise any substantive fourth amendment concerns." *United States v. Palmer*, 770 F.2d 167, 1985 WL 13528, at *5 (6th Cir. 1985); *see also People v. Godboldo*, No. 323261, 2016 WL 299707, at *5 (Mich. Ct. App. Jan. 21, 2016*), appeal denied*, 878 N.W.2d 856 (Mich. 2016), *reconsideration denied*, 882 N.W.2d 155 (Mich. 2016) (holding removal order did not violate Fourth Amendment or state law when it "did not specify who was authorized to take the child into protective custody" because "the court rule permitted the officers who entered the home to take the child into protective custody"). At bottom, plaintiffs have not identified the sort of "glaring deficiency that any reasonable officer would have known was constitutionally fatal." *Groh*, 540 U.S. at 564.

We also reject plaintiffs' argument that the manner in which the City Defendants entered plaintiffs' home violated the Fourth Amendment. *See* Appellant Br. at 34. Plaintiffs complain that Officer Bridson "pushed his way past" Brent to effectuate the child removal order and refused to produce the order until "five minutes" after entering the home. R. 222 (Second Am. Compl. at 53) (Page ID #5223). The Fourth Amendment bars the use of excessive force in

---

[9]Under Michigan law, a preliminary hearing must be held within 24 hours after a child has been taken into protective custody. Mich. Ct. R. § 3.965(A)(1).

effectuating a warrant, *see, e.g.*, *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010); *Miller v. Sanilac Cty.*, 606 F.3d 240, 251 (6th Cir. 2010), but "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment," *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Here, Brent concedes that he refused to allow the officers to enter his home after being told that they had a warrant to remove Brent's children. R. 222 (Second Am. Compl. at 53) (Page ID #5223).  In such circumstances, Officer Bridson's pushing of Brent—which was not alleged to be unduly violent or forceful—was not unreasonable.  *See Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (holding officers did not violate Fourth Amendment where members of household "repeatedly disobeyed lawful officer commands" and officers' use of force was not "gratuitously violent").  And, in any event, such limited contact did not violate clearly established law.  *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (officers pushing homeowner "'violently' to the floor despite the fact that he was visibly bandaged" did not violate clearly established Fourth Amendment law under the circumstances presented).  The alleged five-minute delay between entry and allowing Brent to view the warrant is also constitutionally acceptable.  *See Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 442–47 (6th Cir. 2006) (concluding that the Warrant Clause of the Fourth Amendment does not "require[] officers to produce a copy of the warrant (and any affidavit) at the outset of the search").  Plaintiffs have therefore failed to raise any viable § 1983 claims against the Detroit Police Officers.[10]

### 3. *Monell* Claim

Plaintiffs' failure-to-train and failure-to-supervise claims against the City of Detroit also fail.  "A plaintiff may seek damages against a municipality where the municipality has a custom, policy, or practice that resulted in deprivation of the plaintiff's constitutional rights."  *Gonzalez v. Kovacs*, 687 F. App'x 466, 470 (6th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S.

---

[10]To the extent that plaintiffs mean to argue that the officers were unnecessarily rough in "ripp[ing] [the youngest child] from his mother and push[ing] him out the door," R. 222 (Second Am. Compl. at 53) (Page ID #5223), plaintiffs lack standing to assert those claims. *See Jezowski v. Thompson*, No. 1:16-CV-13242, 2018 WL 3060250, at *5 (E.D. Mich. May 18, 2018), *report and recommendation adopted*, No. 16-CV-13242, 2018 WL 3048500 (E.D. Mich. June 20, 2018).

658, 690–91 (1978)). Here, as in *Gonzalez*, plaintiffs' complaint failed to allege "a single fact that suggests, plausibly or otherwise," that the Detroit Police Officers' purported Fourth Amendment violations were "the result of a custom, policy, or practice of [the City of Detroit]. The district court therefore properly dismissed this count of [plaintiffs'] complaint." *Id.*

In their response to the City Defendants' Rule 12(c) motion and in their opening brief before this court—but not in their complaint—plaintiffs asserted that "the Detroit Police Department was under a consent order to cure the very Fourth Amendment violations that occurred here" and was therefore "well aware that constitutional violations were occurring on a regular bas[i]s" but nevertheless "took no steps whatsoever to attempt to cure these issues." Plaintiffs failed to reference or discuss this consent order in their complaint and never attached the consent order to its briefings before the district court, such that the district court would have been required to expressly exclude the additional material or convert the City Defendants' motion to a motion for summary judgment. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006). As a result, the district court was not required to consider these vague, outside-the-pleadings allegations in assessing the City Defendants' motion under Rule 12(c), and neither are we. *Cf. Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) ("When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings . . .").

Finally, plaintiffs insist that the City ought to be held liable for failing to enforce its alleged policy barring Detroit Police Officers from serving civil orders. *See* R. 222 (Second Am. Compl. at 54) (Page ID #5224). We fail to see how serving civil orders in violation of this purported internal policy amounts to a constitutional violation, and thus the City's failure to enforce this policy adequately (assuming it exists) does not create liability under *Monell*. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

**4. Intentional Infliction of Emotional Distress**

The district court properly held that statutory immunity precluded plaintiffs' IIED claim against the City Defendants. Michigan law immunizes government officials from liability for intentional torts if

> (a) [t]he acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial.

*Odom*, 760 N.W.2d at 228. The district court determined that the individual defendants had adequately pleaded the elements for statutory immunity in their answer to plaintiffs' complaint, and plaintiffs had failed to plead facts suggesting that the defendants' conduct was unreasonable, not taken in good faith, or undertaken with malice. R. 250 (Order at 9–10) (Page ID #5530–31). As a result, the district court entered judgment in defendants' favor on plaintiffs' IIED claim. *Id.* Plaintiffs then moved for reconsideration and attached to their motion an internal Detroit Police Department policy purportedly showing that Detroit police officers should not execute civil orders. *See* R. 253 (Pls. Mot. for Reconsideration at 8–9, Ex. 1) (Page ID #5550–51, 5555–56). In their motion, plaintiffs argued that the individual officers could not claim that they acted within the scope of their authority, acted in good faith, or performed "discretionary" acts when they executed the civil order in violation of the police department's internal policy. *Id.* at 8–9 (Page ID #5550–51). The district court denied plaintiffs' motion for reconsideration, reasoning that "[n]othing about [the plaintiffs' exhibit] suggests the officers acted unreasonably under the circumstances when they executed the order to remove Brent's children from the home." R. 261 (Order at 8) (Page ID #5655). We agree.

We note at the outset that the district court was free to consider the attachment plaintiffs enclosed with their motion for reconsideration, as plaintiffs referred to the Detroit Police Department's purported policy regarding civil orders in their complaint, and that document is "central to the claims contained therein." *See Bassett*, 528 F.3d at 430. In reviewing that document, we agree with the district court that the document lends no support to plaintiffs' repeated assertion that "the Detroit Police has a policy strictly prohibiting the Detroit Police from executing civil orders." Appellant Br. at 38. Rather, the document states only that "[w]arrants

and writs issued by competent judicial authority emanating from civil cases are generally the responsibility of the county sheriff, court appointed bailiffs, or court officers of the 36th District Court," and "[g]enerally, officers will not be dispatched to requests for assistance by bailiffs, court officers, or city officials, unless a breach of the peace is imminent." R. 253 (Pls. Mot. for Reconsideration, Exhibit 1) (Page ID #5555). The document therefore does not show that the officers acted in bad faith, with a lack of authority, or with a lack of discretion.

Moreover, plaintiffs' complaint, read against the backdrop of Michigan law, compels the conclusion that the officers are entitled to statutory immunity. Defendants plainly acted within the scope of their authority when they executed the removal order, as Michigan Court Rule 3.963 specifically contemplates that "a child protective services worker, an *officer*, or [an]other person deemed suitable by the court" may take children into protective custody pursuant to a removal order. *See* Mich. Ct. R. 3.963(B)(1) (emphasis added); *see also Godboldo*, 2016 WL 299707, at *5 (holding that Michigan law authorized police officers to execute removal order and take children into protective custody). And the district court correctly determined that plaintiffs had not averred facts allowing the inference that defendants had acted with malice. *See Stoll v. Luce Mackinac Alger Schoolcraft Dist. Health Dep't Bd. of Health*, No. 316287, 2014 WL 5364085, at *3 (Mich. Ct. App. Oct. 21, 2014) (holding defendant entitled to governmental immunity where the plaintiff's complaint had "concluded that [the defendant] acted with malice, but [the plaintiff] offered no facts to support his conclusions"). Finally, all conduct attributed to the officers in this case was discretionary as a matter of law. *See Norris v. Lincoln Park Police Officers*, 808 N.W.2d 578, 582 (Mich. Ct. App. 2011) ("A police officer's decisions regarding how to respond to a citizen, how to safely defuse a situation, and how to effectuate the lawful arrest of a citizen who resists are . . . clearly discretionary."). The district court therefore properly entered judgment in the City Defendants' favor on plaintiffs' IIED claims.[11]

---

[11]The district court entered judgment on behalf of all City Defendants on plaintiffs' IIED claim, even though the district court's analysis focused exclusively on whether the individual defendants were entitled to governmental immunity. *See* R. 250 (Order at 8–10) (Page ID #5529–31). As plaintiffs have not argued that the district court erred in entering judgment in favor of the City of Detroit as to plaintiffs' IIED claim, we need not consider the issue. Nonetheless, for the sake of completeness, we note that under Michigan law, "the City of Detroit could only be held liable for the intentional misconduct of an employee acting within the scope of his or her employment, and that absent such a finding of liability on the part of any individual defendant police officer, a

## F. Gross Negligence Claims Against City and State Defendants

In their final argument regarding the City and State Defendants, plaintiffs contend that the district court erred in sua sponte striking plaintiffs' claim for "gross negligence" from the second amended complaint. In dismissing these claims, the district court reasoned that "Michigan law does not allow an independent cause of action, defined as 'gross negligence,' to lie where allegations of an intentional tort have been made." R. 221 (Order at 26–27) (Page ID #5153–54). Plaintiffs now argue that the district court erred because (1) the defendants were required to raise this defense affirmatively, and (2) the Federal Rules of Civil Procedure allow plaintiffs to raise alternative theories of liability. *See* Appellant Br. at 36–37. We review de novo the district court's dismissal of plaintiffs' gross-negligence claim. *See Meros v. Kilbane*, 107 F.3d 12, 1997 WL 48984, at *2 (6th Cir. 1997).

### 1. City Defendants

A district court generally may not dismiss a complaint sua sponte without first giving notice to the plaintiff. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 558 (6th Cir. 2012). Here, however, plaintiffs have not complained about insufficient notice, and any potential prematurity in the district court's dismissal of plaintiffs' gross-negligence claims against the City Defendants was harmless because "no amendment would have allowed [plaintiffs] to obtain relief from the defendants." *Tidik v. Kaufman*, 156 F.3d 1232, 1998 WL 466571, at *1 (6th Cir. 1998).

Michigan's governmental immunity statute protects government officers from tort liability unless their "conduct . . . amount[s] to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c). Thus, "establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity." *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). Michigan's immunity statute does not, however, provide an independent cause of action for "gross negligence," and plaintiffs may not bypass the immunity statute by "transforming

---

verdict must be entered on behalf of the City of Detroit and against Plaintiffs in this case." *Holloway v. McIntyre*, 838 F.2d 471, 1988 WL 7961, at *2 (6th Cir. 1988).

intentional excessive force or battery claims into negligence claims." *Jackson v. Lubelan*, 657 F. App'x 497, 502 (6th Cir. 2016). As plaintiffs here are seemingly attempting to reframe Officer Bridson's alleged "assault" of Brent as a claim for gross negligence, *see* Appellant Br. at 38, the district court correctly dismissed plaintiffs' gross-negligence claim against the City Defendants. Asserting that plaintiffs have failed to state a claim under Michigan law is not an affirmative defense, and thus the district court did not err in dismissing the claim sua sponte. *See* Mich. Comp. Laws § 2.111(F)(3) (defining affirmative defenses).

Plaintiffs, however, insist that their gross-negligence claim is premised not only on the officers' alleged "forced entry and assault," but also on the officers' failure to abide by the Detroit Police Department's alleged policy against executing civil orders. Appellant Br. at 38. According to plaintiffs, "[w]hether the officers intentionally ignored this mandate or w[ere] neglectful in their duties is at this point a material issue of fact to be determined by the jury." *Id.* Plaintiffs are correct to suggest that they may bring common-law negligence claims based on allegations that could also undergird intentional-tort claims, in that they may allege that "even if intentional conduct did not cause [their] injuries, 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results' did." *Jackson*, 657 F. App'x at 503 (citation omitted). But a plaintiff seeking to raise a common-law negligence claim must show that the defendant owed him a duty of care, and, here, plaintiffs have identified no statute, contractual relationship, or common-law principle that imposes a duty running from Detroit police officers to private citizens requiring the officers to abide by internal departmental polices regarding the execution of child removal orders. *See Cummins v. Robinson Twp.*, 770 N.W.2d 421, 434 (Mich. Ct. App. 2009). Thus, even assuming the Detroit Police Department has a policy against executing such orders, the district court properly struck plaintiffs' gross-negligence claim against the City Defendants from the second amended complaint.

## 2. State Defendants

The district court's striking of plaintiffs' gross-negligence claims against the State Defendants was erroneous. As noted above, plaintiffs are barred from bringing gross-negligence claims only if those claims are "fully premised" on alleged intentional torts. *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), *overruled on other grounds by Odom*,

760 N.W. 2d 217. Here, however, plaintiffs allege that various State Defendants were grossly negligent in failing to follow certain procedures and statutory obligations. *See, e.g.*, R. 211 (Proposed Second Am. Compl. at 19) (Page ID #5008) (alleging that Wenk amended the removal petition to assert that one of Brent's children had "high lead sometime in the past" without conducting an investigation, as allegedly required "by written policy"). We have previously entertained gross-negligence claims premised on similar allegations that social workers failed to follow the procedures set forth in the Michigan Child Protection Law. *See Jasinski v. Tyler*, 729 F.3d 531, 536–37, 544–45 (6th Cir. 2013). The district court therefore erred in striking plaintiffs' gross-negligence claims on the ground that they were not cognizable under Michigan law. While it is possible that the claims should be dismissed for other reasons, we leave it to the district court to make such determinations in the first instance. *See Stanek*, 323 F.3d at 480. We therefore **REVERSE** the district court's striking of plaintiffs' gross-negligence claims against the State Defendants and **REMAND** for further proceedings consistent with this opinion.

## G. Remand to a Different District Court Judge

Plaintiffs have asked this court to reassign this case to a different district court judge on remand. "This Court possesses the power, under appropriate circumstances, to order the reassignment of a case on remand pursuant to 28 U.S.C. § 2106." *Lavin v. Husted*, 764 F.3d 646, 651–52 (6th Cir. 2014) (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014)). In assessing whether to reassign a case, we consider:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings;
>
> (2) whether reassignment is advisable to preserve the appearance of justice; and
>
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 652 (quoting *Rorrer*, 743 F.3d at 1049). Reassignment is an "extraordinary power" that should "rarely be invoked." *Id.* (second quote quoting *Rorrer*, 743 F.3d at 1049).

We have reviewed the record of this case, along with the allegations levied by plaintiffs against the district court in their appellate briefing and in their motion for disqualification before the district court. *See* R. 273 (Mot. to Disqualify) (Page ID #5744–67). We agree with the

district court that "no reasonable person could conclude that the Court's decisions in favor of [defendants] in this case are the product of deep-seated favoritism and antagonism." R. 279 (Order at 6) (Page ID #5836). We also find no reason to believe that the district court would have "substantial difficulty in putting out of his or her mind previously expressed views or findings." *Lavin*, 764 F.3d at 652 (quoting *Rorrer*, 743 F.3d at 1049). We do, however, have grave concerns, given the procedural complexity and duration of this case, that reassignment would result in "waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* We therefore decline to exercise our power of reassignment here.

### III. CONCLUSION

This case has been long, complicated, and procedurally messy. We sympathize with the plaintiffs' efforts to remedy perceived wrongs, defendants' efforts to defend against this longstanding suit, and the district court's efforts to resolve each claim properly. We now **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.